THE CAPE HATTERAS ACCESS PRESERVATION ALLIANCE, Dare County, North Carolina, Hyde County, North Carolina, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, United States Fish and Wildlife Service, Gale Norton, Steven Williams, Defendants,

Defenders of Wildlife, Center for Biological Diversity, Southern Appalachian Biodiversity Project, Defendant–Interveners

No. CIV.A.03–217(RCL).

United States District Court, District of Columbia.

Nov. 1, 2004.

Lawrence R. Liebesman, Rafe Petersen, Ethan Ray Arenson, Holland & Knight, LLP, Washington, DC, for Plaintiffs.

Mary Melissa Whittle, U.S. Department of Justice, William J. Snape, Defenders of Wildlife, Washington, DC, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case concerns the piping plover, a small, sand-colored shorebird, and the designation of its critical habitat under the Endangered Species Act. Defendants, the Department of the Interior and its Fish and Wildlife Service (collectively the "Service"), designated 137 coastal areas to serve as the wintering plovers' critical habitat. Plaintiffs, a business association and two North Carolina counties, challenge numerous aspects of the Service's designation. Upon consideration of the parties' cross motions [19 and 21] for summary judgment, the oppositions and replies thereto, and the administrative record, the Court, for the reasons set forth in this Memorandum Opinion, grants in part and denies in part both motions.

### I. Background

#### A. ESA, NEPA, and Designation of Critical Habitat

Enacted in 1973, the Endangered Species Act ("ESA"), is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Among the congressionally identified purposes of the Act are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An endangered species is a species that is "in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), while a threatened species is a species that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20). Congress conferred partial responsibility for implementing the ESA on the Secretary of the Interior, *id.* 1532(15), who, in turn conferred her responsibilities to the Service.

The ESA authorizes the Service to protect a species by listing it as threatened or endangered, *id.* § 1533(a)(1), and then requires the Service to designate that species's critical habitat, *id.* § 1533(a)(3), those lands that are essential to its conservation, *id.* § 1532(5)(A). While determinations as to whether or not a species is endangered or threatened must be made "solely on the basis of the best scientific and commercial data available," *id.*

§ 1533(b)(1)(A), designation of critical habitat additionally requires consideration of economic and other impacts, *id.* § 1533(b)(2).

A critical habitat designation provides protection for threatened and endangered species by triggering what is termed a Section 7 consultation in response to actions proposed by or with a nexus to a federal agency. *Id.* § 1536(a)(2). Section 7(a)(2) of the ESA requires each federal agency, in consultation with the Service, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species ... which is ... critical." *Id.* A Service regulation, not the ESA, defines "[j]eopardize" as "an action that reasonably would be expected ... to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. The same regulation defines "[d]estruction or adverse modification" as an "alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

If an agency action may adversely affect a listed species's critical habitat, the action agency and the Service enter into a formal consultation process, at the conclusion of which the Service issues a biological opinion as to the effect of the federal agency action. If the Service concludes that the action will likely result in adverse modification of critical habitat, the Service shall set forth any reasonable and prudent alternatives to the action. *See* 50 C.F.R. § 402.14; 16 U.S.C. § 1536(b)(3)(A).

 The National Environmental Policy Act ("NEPA"), a statute separate from the ESA, requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that went into the agency's decision-making. *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Specifically, NEPA requires, "to the fullest extent possible," all agencies of the federal government to prepare environment impact statements for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

## B. The Service's Designation

In July 2001, the Service published a final rule in the Federal Register that designates as critical habitat for the wintering plover population 137 coastal areas in states from North Carolina to Texas. Final Determination of Critical Habitat for Wintering Piping Plovers, 66 Fed.Reg. 36,-038 (July 10, 2001).

The 2001 designation came nearly 16 years after the Service published its final rule pursuant to the ESA listing the plover as endangered in the Great Lakes watershed and threatened in the remainder of its range, including on its migratory routes and its wintering grounds, where the plover spends up to 10 months each year. AR 13345, 49 (citing Determination of Endangered and Threatened Status for the Piping Plover, 50 Fed.Reg. 50,726 (Dec. 11, 1985)). Back in 1985, the Service declined to designate any critical habitat for the plover. In 1996, the Defenders of Wildlife filed suit to compel critical habitat designation for the Great Lakes and Northern Great Plains populations of piping plovers. In 2000, a court ordered the Service to carry out these designations. AR 13345 (citing *Defenders of Wildlife v. Babbitt,* Nos. 96–CV–2695, 97–CV–777 (D.D.C Feb. 8, 2000)). All U.S. piping plover populations winter along the Atlantic Coast south of North Carolina, along the Gulf Coast,

and in the Caribbean. AR 13344. Unable to isolate the two piping plover populations subject to the lawsuits from other populations when on their wintering grounds, the Service chose to designate critical habitat for all U.S. wintering piping plovers collectively. AR 13345.

In North Carolina, the Service designated 18 areas, NC–1 to NC–18, totaling some 6800 acres and 126 linear miles of shoreline. AR 13372, 13392–98.

### C. Plaintiff's Interests

Plaintiff Cape Hatteras Access Preservation Alliance ("CHAPA") is a project of the Outer Banks Preservation Alliance ("OBPA") formed with the goal of "preserving and protecting a lifestyle and way of life historically prevalent on the Outer Banks of North Carolina, specifically, Cape Hatteras National Seashore" ("CHNS"). The OBPA works with the National Park Service to develop a plan for the use and management of off-road vehicles that will protect the seashore's resources without harming the area's unique lifestyle and economic well-being. CHAPA members regularly operate off-road vehicles, the main means for accessing seashore beaches, for both recreational and commercial purposes. AR 08206. Off-road vehicles provide recreational access to seashore beaches that is essential for the area's tourism-based economy.

Plaintiffs Dare County and Hyde County (the "Counties") contain the CHNS, which drew 3.3 million tourists in 2000. Dare County encompasses seven of the seashore's eight unincorporated villages and six municipalities, Duck, Kill Devil Hills, Kitty Hawk, Manteo, Nags Head, and Southern Shores. While the county's permanent population is 29,000, the county's average daily population during the summer months ranges from 200,000 to 225,000. Dare County's 2001 revenue

from tourism was over $365 million. Plaintiff Hyde County, home to just 5,500 people, includes the Ocracoke Island portion of the CHNS. The island depends on tourism, which generated an economic impact of $24 million in 2001. Ocracoke beach is a nationally known tourist destination and is the sixth best beach in the U.S., as ranked by Dr. Stephen Leatherman of Florida International University.

Through letters responding to the Service's proposed critical habitat rule, the Service became aware of the plaintiffs' position that designation would have adverse effects for plaintiffs' tourism industry and for residents' and visitors' recreational and commercial uses. AR 8206; AR 15806, AR 16268–77. Plaintiffs fear beach closures and the cost and delay of Section 7 consultations. The National Park Service manages and has a "say over" recreational activities at the CHNS, AR 00994, and states in its final rule that a managing agency can typically protect lands from adverse modifications due to beach driving by "redesignating routes and beach access points, and by temporarily closing off specific areas during critical seasons." AR 13352. Despite this, the Service found that the economic impact of designation was not significant enough to warrant exclusion of these areas. AR 13387.

About 14 months after the Service designated the plover's wintering critical habitat, plaintiffs filed a Notice of Intent to Sue on the Secretary of the Interior and filed the case presently before the Court on February 10, 2003.

### D. The Interveners

On April 11, 2003, the Defenders of Wildlife, Center for Biological Diversity, and Southern Appalachian Biodiversity Project (collectively "Interveners") moved the Court to join this matter as defendant-interveners. The Court granted the mo-

tion by order dated June 12, 2003. Interveners initiated the legal actions that led to the designation of critical habitat for the wintering population of the piping plover—the action the plaintiffs now challenge. Interveners have filed memoranda in support of defendants' motion for summary judgment and in opposition to plaintiffs' motion.

## II. *Standing*

■ Defendants and Interveners question whether plaintiffs have standing to bring this suit. To establish standing, plaintiffs must show that they meets certain constitutional and prudential requirements.

■ Article III of the Constitution requires, a "concrete and particularized injury" that is "(1) actual or imminent, (2) caused by, or fairly traceable to an act challenged in the instant litigation, and (3) redressable by the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Util. Air Regulatory Group v. EPA*, 320 F.3d 272, 277 (D.C.Cir.2003).

Plaintiffs claim injury related to the Service's alleged failure to follow statutory dictates during its designation of the plover's critical habitat. CHAPA[1] asserts a variety of economic and recreational harms. CHAPA members own land within the critical habitat. Some wish to improve land; all need to consider how activity with a federal nexus—such as obtaining wetlands permits, special use permits for building up dunes to protect against the surf, or FEMA insurance—might spur Section 7 consultations about whether the activity would cause impermissible adverse modification to the habitat. *See* Stigliano

Decl.; Ergas Decl. CHAPA members also engage in recreational activities that require access to the CHNS by means of off-road vehicles over routes falling within the critical habitat. At least one CHAPA member must modify his off-road vehicle use to avoid adverse modification. Members fear that the Service's administration of the critical habitat will result in use restrictions on the vehicles and closure of beaches or access points, affecting not only recreation, but the livelihood of fishermen dependent on the vehicles for their daily work. Finally, members fear that the Service's administration will decrease tourism, which would have a dire impact on local businesses, from tackle shops to real estate companies. *See* Couch Decl.

The Counties assert harm related to their tourism economy and their ability to maintain and repair infrastructure and seashore. The Counties, like CHAPA business owners, fear that any restrictions or beach closures within the habitat will have a negative impact on their tourism economy. The critical habitat designation, they further assert, will, because of increased Section 7 consultations, slow down and make costlier the Counties' response and repairs after catastrophic events such as Hurricane Isabel, which damaged county roads and beaches. Finally, the Counties cite the specific example of the ongoing Bonner Bridge replacement project that, again because of consultations, will be delayed and could result in the bridge's relocation. In fact, Interveners have advanced the plover critical habitat designation as one reason in a separate effort to block the bridge project. *See* Sturza Decl.

Both CHAPA and the Counties have, based on the above, alleged injuries that

---

1. Neither the Service nor Interveners raise a problem with CHAPA's organizational standing, and there is no reason to suspect a problem. *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C.Cir.2002) (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

are actual or imminent. These injuries are causally related to the Service's designation, which is the subject of this litigation. *See Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.,* 75 F.3d 1429, 1433 (10th Cir.1996) ("Here, as an owner of property that falls within the proposed critical habitat designation and will likely be adversely affected by such designation, the County is the object of the Secretary's alleged failure[s].")). Finally, this Court could require the Service to revisit its designation. *See id.* Moreover, if, as here, "the suit is one challenging the legality of government action" and "the plaintiff is himself an object of the action (or forgone action) at issue. . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Defenders of Wildlife,* 504 U.S. at 561–62, 112 S.Ct. 2130; *see Catron County,* 75 F.3d at 1433 (applying *Defenders of Wildlife* to the designation of critical habitat). Therefore, plaintiffs have demonstrated constitutional standing.

■■■ With the constitutional requirements met, plaintiffs must next establish prudential standing by demonstrating that the injury "arguably falls within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Plaintiffs, whether asserting claims of under-enforcement or over-enforcement, have prudential standing to challenge the legality of the Service's actions under the ESA by virtue of its citizen suit provision, 16 U.S.C. § 1540(g)(1)(c). *Bennett,* 520 U.S. at 166, 117 S.Ct. 1154. Plaintiffs also have pru-

dential standing to challenge the Service's lack of compliance with NEPA. CHAPA's assertion of future recreational harms are within the zone of interests protected by the statute. *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1236 (D.C.Cir.1996) (noting that even those not "pure of heart" can assert, under NEPA, aesthetic and environmental interests in the quality of public lands for activities such as camping, hiking, and fishing); *Overseas Shipholding Group, Inc. v. Skinner,* 767 F.Supp. 287, 294 (noting that harms need not be actual, but only reasonably foreseeable), as are the Counties' assertions of harms they suffered in relation to repair of area beaches after Hurricane Isabel and harms to the quality of life of residents related to the physical environment, *see Hanly v. Mitchell,* 460 F.2d 640 (2d Cir.1972). Therefore, this Court can reach the merits of plaintiff's case.[2]

### III. Standard of Review

■■■ The Service's designation of critical habitat for the wintering piping plover is reviewed pursuant to the standard in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.,* 248 F.3d 1277, 1281 (10th Cir.2001) (challenge to merits of critical habitat designation reviewed under the APA); *Wyo. Outdoor Council v. Bosworth,* 284 F.Supp.2d 81 (D.D.C.2003). Under this standard, a court may set the action aside only if the Service's decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *C & W Fish Co. v. Fox,* 931 F.2d 1556, 1562–1565 (D.C.Cir.

---

**2.** The Court notes that, for each claim, if constitutional and prudential standing can be shown for at least one plaintiff, standing may extend to all plaintiffs, and the Court need not

consider the standing of the other plaintiffs to raise that claim. *Mountain States Legal Found.,* 92 F.3d at 1232.

1991). In making this inquiry, the Court asks whether the Service considered the relevant factors and whether or not it made a clear error of judgment. "At a minimum, the agency must have considered relevant data and articulated an explanation establishing a rational connection between the facts found and the choice made. The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Wyo. Outdoor Council,* 284 F.Supp.2d at 89 (citations omitted). Rather, the agency action under review is entitled to a presumption of regularity. *See Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir. 1981). The burden of proof under the arbitrary and capricious standard is on the party challenging the decision. *See Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs.,* 844 F.Supp. 770, 783 (D.D.C.1993) (citing *Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982)).

■ The Court must review the Service's designation based on the administrative record before the court. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Because there are generally no facts in dispute in administrative record cases, and the court need not and, indeed, may not, "find" underlying facts, there are no material facts essential to the court's resolution of this action, and the parties' motions for summary judgment are appropriate. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n,* 789 F.2d 26, 37 (D.C.Cir.1986)(en banc).

IV. *Analysis of ESA Compliance*

 A. Occupied

■ Any land, whether the listed species occupies the land or not, may take on critical habitat status. Whether and how an area becomes critical habitat first depends on whether a listed species occupies that area. Under the ESA, critical habitat may include "specific areas within the geographical area occupied by the species ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). Critical habitat may also include "specific areas outside the geographical area occupied by the species ... upon a determination by the Secretary that such areas are essential for the conservation of the species." *id.* § 1532(5)(A)(ii). Thus, both occupied and unoccupied areas may become critical habitat, but, with unoccupied areas, it is not enough that the area's features be essential to conservation, the area itself must be essential. All areas designated as critical habitat for the plover were designated based on their status, determined by the Service, as occupied areas. AR 13370–72.

 1. *Service's definition of "occupied"*

■ Plaintiffs first challenge the Service's definition of the statutory term "occupied" found in the ESA as arbitrary and capricious. An agency interpreting a statute it administers gets *Chevron* deference. *See Chevron, U.S.A. v. Nat'l Res. Def. Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the statute clearly speaks to the precise question at issue, that ends the matter. If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

The ESA does not define "occupied" or "geographical area occupied by the spe-

cies." Thus, under *Chevron*, the question becomes whether the Service's definition is permissible. The Service does not have a regulation that imposes a single definition of "occupied" for all species; rather, the Service has retained flexibility and defines the term differently depending on a given species's characteristics. The Service's final rule for the plover does not explicitly define "occupied," yet the rule makes clear that, with a limited exception, the areas considered as candidates for critical habitat were those areas meeting specific criteria related to the plovers' presence in those areas. AR 13371. The Service looked for areas with "consistent use," which the service defined as those areas where "observations over more than one wintering season" demonstrated plovers' presence. *Id.* at 13370–71. This definition is reasonable and permissible, and therefore the Court defers to the Service's expertise on this matter: this Court has no expertise when it comes to determining which lands a migratory bird, *see* AR 13344, does or does not occupy.

2. *The application of the definition*

 Next, plaintiffs challenge the Service's application of its definition of "occupied" in this case, and contest the validity of survey data that the Service cites. First, Plaintiffs argue that three areas, NC–1, NC–2, and NC–5, can not be considered "occupied" because, based on one survey's results, there were zero sighting of plovers during the winters of 1991 and 1996. The Service's records show, however, that except for the anomalies in 1991 and 1996, there were consistent sightings from 1985–2000, with multiple plover sightings in each area each year. AR 05720. Therefore, these areas had plover observations over more than one wintering season, had "consistent use," and therefore were "occupied" according to the Service's reasonable definition of that term.

Supporting its decision to pay the 1991 and 1996 numbers less credence, the Service had before it reasoned opinions that the 1991 and 1996 survey reports, the so-called International Census reports, suffered from defects. First, International Census reports are compiled during a short period of time, usually a two-week period, thus providing only a snapshot of the plover's distribution. AR 13348. Second, the 1991 report came after a severe blizzard during the 1989–1990 winter as dead shorebirds were seen during that winter and the 1990–1991 winter. The census notes the possibility that the storm caused the one-year drop off in plover numbers. AR 8985–96.

B. Primary Constituent Elements

Once the Service properly determines that a species occupies a candidate area for critical habitat, the Service must then determine that "those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" are "found" on specific areas within that area. 16 U.S.C. § 1532(5)(A)(i). In the Service's parlance, such features that satisfy the act's requirements are Primary Constituent Elements ("PCEs"). *See* 50 C.F.R. § 424.12(b)(5).

Service regulations guide PCE selection:

the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant

pollinator, geological formation, vegetation type, tide, and specific soil types *Id.*

The Service discusses piping plover PCEs in the final rule, *see* AR 13370, and starts by making observations about the bird's behavior. Plovers on the wintering grounds spend the majority of their time foraging. AR 13370, col. 3. When not foraging, plovers roost, preen, bathe, engage in aggressive encounters with other piping plovers and other species, and move among available habitat locations, which include beaches, mud flats, sand flats, algal flats, and washover passes. *Id.* "Wintering plovers are dependant on a mosaic of habitat patches, and move among these patches depending on the local weather and tidal conditions." *Id.*

The Service next states that the PCEs essential for the species are those physical and biological features that support the plovers' documented behaviors on their wintering lands.[3] AR 13370, col. 3. The Service enumerated these features as follows:

> The primary constituent elements are found in geologically dynamic coastal areas that support intertidal beaches and flats (between annual low tide and annual high tide) and associated dune systems and flats above annual high tide.
>
> Important components (primary constituent elements) of intertidal flats include sand and/or mud flats with no or very sparse emergent vegetation. In some cases, these flats may be covered or partially covered by a mat of blue-green algae. Adjacent unvegetated or sparsely vegetated sand, mud, or algal flats above high tide are also important, especially for roosting piping plovers. Such sites may have debris, detritus (decaying

organic matter), or microtopographic relief (less than 50 cm above substrate surface) offering refuge from high winds and cold weather. Important components of the beach/dune ecosystem include surf-cast algae for feeding of pray, sparsely vegetated back beach ... for roosting or and refuge during storms, spits ... for feeding and roosting, salterns ... and washover areas for feeding and roosting.

> . . .

> These habitat components are a result of the dynamic geological processes that dominate coastal landforms throughout the wintering range of piping plovers. These geologically dynamic coastal regions are controlled by processes of erosion, accretion, succession, and sea-level change. The integrity of the habitat components depends upon daily tidal events and regular sediment transport processes, as well as episodic, high-magnitude storm events; these processes are associated with the formation and movement of barrier islands, inlets, and other coastal landforms. By their nature, these features are in a constant state of change; they may disappear, only to be replaced nearby as coastal processes act on these habitats. Given that piping plovers evolved in this dynamic system, and that they are dependent upon these ever-changing features for their continued survival and eventual recovery, our critical habitat boundaries incorporate sites that may lose and later develop appropriate habitat components.

AR 13371, cols. 1–2.

Plaintiffs make three arguments for why the Service's choice of PCEs is deficient. Specifically, plaintiffs argue that the PCEs cannot be essential if, as they assert here, the PCEs are common and transient.

---

3. Plaintiffs do not directly challenge the Service's inference that habitat components are essential based on the plovers' documented use of these components when wintering.

Plaintiffs next ague that the PCEs were not "found" in the designated areas. Finally, plaintiffs argue that the Service has not shown that designated areas may require special management considerations.

### 1. *Common nature of PCEs*

■■■ As to the alleged common nature of the PCEs, the Service argues that a PCE's commonality is irrelevant, so long as the PCE is truly essential. Interveners argue that the PCEs are not common and that plaintiffs have produced no evidence of their common nature. The ESA and Service regulations are silent as to whether PCEs must be uncommon. Common or uncommon, features on occupied area that are essential and that may require special management considerations meet the sole requirements of 16 U.S.C. § 1532(5)(A)(i) and may, assuming all other statutory requirements are also met, lead to that area's designation. Therefore, even if the PCEs in this case are common, that is no statutory fault. Further, Interveners are correct that plaintiffs point to nothing in the administrative record or elsewhere that indicates the plover PCEs are common in the first place.

### 2. *PCEs not found at time of designation*

■■■ PCEs must be "found" on occupied land before that land can be eligible for critical habitat designation. 16 U.S.C. § 1532(5)(A)(i); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 268 F.Supp.2d 1197, 1214 (E.D.Cal.2003).

It appears that, incredibly, the Service admits in the final rule that some designated areas do not contain PCEs. AR 13359 ("While it would be ideal if we could map only areas that currently contain the primary constituent elements, there are three primary reasons we were unable to do so."). Further, within the "Methods" section of the final rule, the Service writes of its designated areas:

> we were unable to exclude all buildings, marinas, paves areas, boat ramps, exposed oil and gas pipelines, and similar structures. These areas do not contain primary constituent elements essential for piping plover conservation and are not considered critical habitat .... The Service will continue to explore ways in which to identify areas within mapped critical habitat boundaries that are not considered critical habitat because they do not contain the primary constituent elements ....

AR 13372. In the administrative record, the Service offers these excuses: sufficient data was not available, the time and expense required to check each area was prohibitive, and that this flexible approach was needed given the dynamic nature of the coastal areas. AR 13359. These excuses have no basis in the statute or in cases; rather, the Service has previously been critiqued for not mounting the proper effort to ensure that PCEs do exist on designated lands. *See Home Builders*, 268 F.Supp.2d at 1214–16. Additionally, as in the *Home Builders* case, the Service asserts that over-designation is not problematic because future Section 7 consultations or pre-consultation conferences will suffice to iron out the true designations. AR 13360 col. 1–2 (offering landowners and agencies the Service's help to "determine whether piping plover habitat occurs on their property").

■■■ The Service may not statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation. *Cf. Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C.Cir. 2001) (chastising the EPA that its "mission is not a roving commission" and that it cannot subject lands to the Clean Air Act that are statutorily excluded). It might be

different if the Service had discussed observations of specific PCEs at one time and had evidence that the PCEs, though not always present, would return during the plover's wintering season. This kind of detail is not in the record. The agency does not document its PCE findings and, to the extend it has designated areas lacking PCEs, appears to rely on hope. Agencies must rely on facts in the record and its decisions must rationally relate to those facts. *See Bowen v. Am. Hospital Assoc.,* 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). That PCEs must be "found" on an area is a prerequisite to designation of that area as critical habitat. The Service's argued-for interpretation, essentially that designation is proper merely if PCEs will likely be found in the future, is simply beyond the pale of the statute.

The Service's admitted over-designation and its proposed solution are problematic for additional reasons. The Service may not over-designate habitat and rely on Section 7 consultations down the road to sort out its errors. *Home Builders,* 268 F.Supp.2d at 1215–16. First, over-designation wrongfully shifts the burden of initiating designation decisions from the Service to future stakeholders. In fact, it creates a whole new procedure, taking designation out of notice and comment rulemaking process and placing it under the consultation process. *See* AR 13360. Second, Section 7 consultations generate costs for other agencies and third parties that would be avoided by proper, up-front designation. Third, such delay is not acceptable when the ESA requires designation at the time of listing. 16 U.S.C. § 1533(a)(3)(A)(i) (The Service "shall, con-

currently with making a determination . . . that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat"); *Home Builders,* 268 F.Supp.2d at 1216 ("Nothing in the ESA permits the Service to defer the assessment of where the essential habitat features are found until consultation.").

The Service's response to these arguments are based in policy. To protect a migratory species, argues the Service, like the plover, the Service needs a flexible approach that permits designation of lands on which the PCEs may later exist. The Service has developed a long-range, 20–year plan that coincides with the predicted recovery timeline of the most endangered of the plover populations and a plan it hopes, will not require significant tinkering as the years go by. *See* AR 02291. While perhaps the Service acts with good intentions, its policy arguments must fail in the face of clear statutory language. The Service must find other, statutorily permissible methods to account for the migratory nature of the plover and its dynamics habitat.[4] On remand, the Service must show that PCEs are found on the areas it designates as critical habitat.

### 3. *PCEs may require special management considerations or protection*

 Occupied critical habitat may not be designated unless the Service determines that the areas designated contain "those physical or biological features [i.e. PCEs]. . . which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). While the word "may" indicates that the requirement for special considerations or protection need

---

4. The Court does not address whether dynamic land capable of supporting plover habitat can itself be one of the "physical or biological features" essential to conservation. The Ser-

vice did not make this argument in its final rule, stating that the PCEs were such things as mud flats. AR 13371.

not be immediate, "it is mandatory that the specific area designated have features which, in the future, may require special consideration or protection." *Home Builders*, 268 F.Supp.2d at 1218. The Service must focus on the management requirements of the area's features, not those requirements of the land merely associated with activities on the land. *Id.*

The Service states—although the statement is tucked away in the answer to a comment about the designation of three particular sites—that the plover's PCEs may require special management consideration or protection. AR 13349. Plaintiffs charge that neither the final rule nor the administrative record support the Services' conclusion. The Service responds with two quotes from two passages of the administrative record.

The first passage, a response to a comment's contention that navigation, dredging, and shoreline stabilization are not harmful to the plover, states that the Service disagrees and that dredging and shoreline manipulations "can have an effect on the bird's food base, and result in permanent habitat loss." AR 13346.

The second passage, found in the section of the final rule labeled "Effects of Critical Habitat Designation," is a statement explicitly made pursuant to the Service's duties under Section 4(b)(8) of the ESA. *See* AR 13384. Section 4(b)(8) states:

> The publication in the Federal Register of any proposed or final regulation which ... designates or revises critical habitat ... shall ... include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

16 U.S.C. § 1533(b)(8). The passage the Service cites lists twelve activities, such as dredging and beach nourishment, that might cause adverse modification or destruction to critical habitat by altering PCEs and have resulted in past Section 7 consultations regarding the plover. AR 13384–85.

Nowhere does the Service directly address the crystal clear statutory requirement that PCEs must be those that may require special management considerations or protection. *See* AR 13370–71 (omitting discussion of the statutory requirement in the obvious place, the section labeled "Primary Constituent Elements"). The Service only mentions the requirement briefly in a response to a comment, passing it over without analysis of any kind AR 13349. Rather than discuss how each identified PCE would need management or protection, the Service lists activities that once resulted in consultations and makes a conclusory statement that dredging or shoreline management could result in permanent habitat loss. This does not meet the Service's burden. *See Home Builders*, 268 F.Supp.2d at 1218. Either the Service never considered the requirement in any meaningful way or chose to omit its discussion or analysis. Regardless, the Service is now engaging in impermissible post-hoc rationalization and needs to revisit its analysis on this point on remand.

## C. Designation of all areas as unoccupied

■■■ Thus far, the Court has only considered the processes related to the designation of occupied lands as critical habitat. The Service maintains that even if its designation of certain occupied lands suffers from defects, it argues that all of its designations are proper even if the lands designated are unoccupied. Recall that critical habitat includes "specific areas outside the geographical area occupied by the species ... upon a determination by the Secretary

that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Service regulations elaborate: "[t]he Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e).

The Service argues that its final rule establishes that all the lands designated not only contain features essential to the plover's conservation but are themselves essential to the plover's recovery. The logic goes this way: Only 32 pairs of plovers from the Great Lakes breeding population remain. AR 13347, col. 3. Since the Service has no data before it that can distinguish this population from the other populations when all come to the wintering habitat, all of the wintering habitat is essential to preserving the one highly endangered population. Yet when the Service speaks of the grave danger to the Great Lakes population, it talks in terms of protecting "sites with consistent occurrence of piping plovers."

Throughout the administrative record, evidence shows the Service acted as though it were dealing entirely with occupied lands. In the final rule, the Service states "[w]e did acknowledge that in cases where unoccupied is involved, there may be additional consultation requirements . . . . [h]owever, we consider all designated wintering piping plover habitat units to be 'occupied.' " AR 13358. The Service asserts critical habitat is found only where PCEs are present. AR 13360. The economic analysis, conducted by a third-party with input from the Service, states that "this rule proposes to designate occupied habitat only" AR 9337. The analysis continued, "[t]he Service asserts that economic costs and benefits from a critical habitat

designation incremental to the listing are largely those which occur on unoccupied lands. This proposal only includes occupied lands." AR 09365. Therefore, the economic analysis went forward as though no unoccupied lands were designated.

Designation of unoccupied land is a more extraordinary event that designation of occupied lands. The Service regulation prohibits designation of unoccupied lands unless designation of occupied lands is insufficient. This finding and reasoning to back it up is made nowhere in the record. The Service cannot attempt to designate as unoccupied those lands it considers occupied and for which it has failed to make the proper showings required by statute.

D. Definiteness of boundaries

 Next, the parties dispute whether the Service has followed its own regulation setting forth how to define the bounds of critical habitat areas. No court has ever interpreted the regulation. The regulation reads:

> Each critical habitat will be defined by specific limits using reference points and lines as found on standard topographic maps of the area. Each area will be referenced to the State(s), county(ies), or other local governmental units within which all or part of the critical habitat is located. Unless otherwise indicated within the critical habitat descriptions, the names of the State(s) and county(ies) are provided for information only and do not constitute the boundaries of the area. Ephemeral reference points (e.g., trees, sand bars) shall not be used in defining critical habitat.

50 C.F.R. § 424.12(c). For the plover, the Service's definitive boundary definitions are the textual unit descriptions in the final rule. AR 13392. In many of these descriptions, the Service uses mean lower low water ("MLLW") lines and vegetation

lines as boundaries. Plaintiffs assert that these lines are ephemeral [5] while the Service and Interveners contend they are not.

An agency's interpretation of its own regulation should be given *Auer* deference. *See Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). Under *Auer*, an agency interpretation of its own regulation controls unless "plainly erroneous or inconsistent with the regulation." *Aurer*, 519 U.S. at 461, 117 S.Ct. 905 (citation omitted). However, "*Auer* deference is warranted only when the language of the regulation is ambiguous." *Christensen v. Harris Cty.*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Deference to the agency's position when the regulation is clear "would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation."

Here, the Service contends that the MLLW and vegetation lines described in the final rule are sufficient references. They claim the lines are not ephemeral reference points because, though they may shift over time, they will always exist: trees may one day fall and sandbars may disappear, but the boundary between sand and greenery is more permanent and easily visible. Plaintiffs counter that moving boundaries are indeed ephemeral reference points, are not static or specific, and therefore cannot provide notice to landowners, which plaintiffs contend is the acknowledged purpose of the regulation. *See* AR 02218 (agency email).

There is some ambiguity in the regulation concerning what "ephemeral" includes. To have this Court reject the Service's use of MLLW and vegetation lines, plaintiffs must show that the Service's use of these lines is "plainly erroneous or inconsistent with the regulation." *Aurer*, 519 U.S. at 461, 117 S.Ct. 905. Plaintiffs have not met this burden. Webster's Ninth New Collegiate Dictionary defines "ephemeral" as "lasting one day only" or "lasting a very short time." Based on this definition, "ephemeral" appears to be unconcerned with whether the ephemeral thing moves or is fixed in place, but whether the thing exists for a long or short period of time. Therefore, it is reasonable for the Service to have included movable yet long-lasting lines, such as the MLLW and vegetation lines.

Plaintiffs' further argument, that textual descriptions are inherently inadequate, must fail. Textual descriptions that name reference points and otherwise comport with the regulatory and statutory requirements are permissible. That similar designations have at times delineated habitat by static coordinates does not render a textual description inadequate.

### E. Economic Analysis

Economics must play a role in critical habitat designation. "The Secretary shall designate critical habitat ... on the basis of the best scientific data available and after taking into consideration the economic impact ... of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). While economics must play a role, the Service has discretion when it

---

**5.** Plaintiffs do not argue that the MLLW or vegetation lines are not "lines as found on standard topographic maps." Related to its argument that the MLLW and vegetation lines are ephemeral, plaintiffs take a policy position that such lines are vague and cannot provide adequate notice, but plaintiffs make no representations about whether such lines do or do not appear on maps. While the Court is skeptical that such lines appear on maps, the Court will not go outside the briefs and the cited portions of the administrative record to discuss this hypothetical defect sua sponte.

comes time to decide whether to exclude areas from a critical habitat designation. "The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id.*

The parties have focused their attention on the analysis of economic impacts flowing from predicted Section 7 consultations. Certain federal actions trigger consultations: those that are "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2). A Service regulation defines "[j]eopardize" as "an action that reasonably would be expected ... to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. The same regulation defines "[d]estruction or adverse modification" as an "alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.* (emphasis added).

The Service concluded in its final rule that "no significant economic impacts are expected from critical habitat designation above and beyond those already imposed by the listing of wintering piping plovers." AR 13387.

Plaintiffs raise two closely related challenges to the Service's economic analysis. First, plaintiffs accuse the Service of following the functional equivalence approach. Second, plaintiffs challenge the Service's baseline approach to ascertaining the costs of designation.

Functional equivalence is the theory that the designation of critical habitat serves a minimal additional function separate from the listing a species—that the effects of designation are mainly a subset of the effects of listing. In the words of the Service:

> on occupied critical habitat, a project that is unlikely to jeopardize the continued existence of a species is not likely to destroy or adversely modify critical habitat. Therefore, on occupied critical habitat, consultations and project modifications are likely to flow from the listing of the species, and no additional consultations or project modifications are likely to result as a "but for" effect of the critical habitat designation.

Def. Opp. Br. at 29; *see also* AR 13387 (stating this view in the final rule).

The baseline approach to calculating the economic impact of proposed critical habitat designations involves comparing the state of the world without or before the designation, the baseline, with the state of the world with or after the designation.

When the Service employs functional equivalence and baseline analysis in tandem to predict the economic impact of future Section 7 consultations, the result is syllogistic: *no additional consultations or project modifications are likely to result from designations, the world before and after designations will likely have the same number of consultations and modifications, therefore, designations have no incremental economic impact related to these consultations and modifications.*

Circuit courts are uncomfortable with this syllogism that threatens to, as a practical matter, remove from consideration the economic analysis required by statute. The Circuit Courts have reacted in, mainly, two ways. While the Fifth and Ninth Circuits take issue with the functional equivalence doctrine, *Sierra Club v. U.S.*

*Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir.2001); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir.2004), the Tenth Circuit takes issue with the baseline approach, *N.M. Cattle Growers Ass'n*, 248 F.3d at 1285. Before reaching the facts of this case, the Court must sort through this law.

### 1. *The approaches of the Circuit Courts*

The Fifth and Ninth Circuits have rejected functional equivalence, and the Service regulation supporting it, as inconsistent with the express language of the ESA. *Sierra Club*, 245 F.3d *passim;* *Gifford Pinchot*, 378 F.3d *passim.* It is the Tenth Circuit, though, that best lays out the origins and problems with the functional equivalence doctrine:

> The root of the problem lies in the [Service]'s long held policy position that [critical habitat designations] are unhelpful, duplicative, and unnecessary.
>
> . . .
>
> the policy position of the [Service] finds its root in the regulations promulgated by the [Service] in 1986 defining the meaning of both the "jeopardy standard" (applied in the context of listing) and the "adverse modification standard" (applied in the context of designated critical habitat).... [T]he standards are defined as virtually identical, or, if not identical, one (adverse modification) is subsumed by the other (jeopardy). *See*

*Am. Rivers v. Nat'l Marine Fisheries Serv.*, 1999 U.S.App. LEXIS 3860 *5 (9th Cir. Jan. 11, 1999) (agreeing with the agency that " 'jeopardy' and 'critical habitat' ... are 'closely related,' and [thus] the jeopardy discussion properly 'encompasses' the critical habitat analysis").

*N.M. Cattle Growers Ass'n*, 248 F.3d at 1283.

While the Tenth Circuit did not consider the validity of the regulation it discussed, *id.*, the Fifth and Ninth Circuits both invalidated the regulation's definition of the adverse modification standard. These courts did not strike the definition because it was entirely identical to the definition of the jeopardy standard, *Sierra Club*, 245 F.3d at 441,[6] but rather struck the adverse modification definition because it was blatantly inconsistent with the ESA's recovery goal and had largely been subsumed by the definition of the jeopardy standard.

One regulatory definition subsumes a second definition blatantly inconsistent with the ESA: this, the courts pointed out, made possible the doctrine of functional equivalence. These courts noted that the ESA requires costly Section 7 consultations in two distinct circumstances: when an activity will jeopardize a listed species and when an activity will result in destruction or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(a)(2). A Service regulation defines "[j]eopardize" as "an action that reasonably would be ex-

---

**6.** The Fifth Circuit, despite its ultimate conclusion that the definition for adverse modification was contrary to the ESA, saw the two definitions as somewhat distinct:

> The mere fact that both definitions are framed in terms of survival and recovery does not render them equivalent. Significantly, the destruction/adverse modification standard is defined in terms of actions that diminish the "value of critical habitat" for survival and recovery. Such actions con-

ceivably possess a more attenuated relationship to the survival and recovery of the species. The destruction/adverse modification standard focuses on the action's effects on critical habitat. In contrast, the jeopardy standard addresses the effect of the action itself on the survival and recovery of the species. The language of the ESA itself indicates two distinct standards; the regulation does not efface this distinction.

*Sierra Club*, 245 F.3d at 441.

pected ... to reduce appreciably the likelihood of *both the survival and recovery* of a listed species." 50 C.F.R. § 402.02 (emphasis added). The same regulation defines "[d]estruction or adverse modification" as an "alteration that appreciably diminishes the value of critical habitat for *both the survival and recovery* of a listed species." *Id.* (emphasis added). Under the Service's regulation, by virtue of the "and"s, both listing and designation result in consultations only when a species's survival is at stake, which makes it impossible for an action to bring about a consultation if only recovery is at stake. The definition of the adverse modification standard, then, fails to account for the ESA's command that critical habitat be designated for "conservation," and not merely survival. 16 U.S.C. § 1532(5)(A); *Gifford Pinchot,* 378 F.3d at 1070; *Sierra Club,* 245 F.3d at 441–42. In effect, the definition of the adverse modification standard, with its impetus on survival, is all but subsumed by the jeopardy standard. *Id.; see also N.M. Cattle Growers Ass'n,* 248 F.3d at 1283; *Home Builders,* 268 F.Supp.2d at 1230 ("[T]he Service's policy position [is] expressed in 50 C.F.R. § 402.02 [which is] defining the jeopardy standard used in listing as fully encompassing the adverse modification standard used in designating critical habitat."). The regulation, then, is the root of the Service's doctrine of functional equivalence: the regulation permits the Service to assert that actions meeting the adverse modification standard almost always meet the jeopardy standard, making consideration of jeopardy a proxy for consideration of adverse modification.

The effect of functional equivalence on economic impact analysis and on conservation efforts quickly follows. The doctrine and regulation hold that actions interfering with conservation but not survival are not adverse modification or destruction. Thus, the Service's own regulation causes it to undercut the importance of critical habitat, to underestimate the number of Section 7 consultations, and thus, to undercount the economic impact of its regulations while simultaneously under-protecting the species it is statutorily charged with protecting. *Sierra Club,* 245 F.3d at 442; *Gifford Pinchot,* 378 F.3d at 1071.

Unlike the Fifth and Ninth Circuits that rejected the Service's functional equivalence doctrine and regulation, the Tenth Circuit has rejected the Service's baseline economic analysis. *N.M. Cattle Growers Ass'n,* 248 F.3d at 1285. The Tenth Circuit saw the same problem: it saw the same flaws in the functional equivalence regulation that the other circuits found repugnant, *id.* ("[E]conomic analysis done using the [Service's] baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02."), and it recognized that the "root of the problem lies in the [Service's] long held policy position that [critical habitat designations] are unhelpful, duplicative, and unnecessary," *id.* at 1283. The Tenth Circuit, however, could not decide the validity of the regulation because it was not before the court. *Id.* Rather than stifle Congress's intent "that the [Service] conduct a full analysis of all the economic impacts of a critical habitat designation," the court held that the Service must consider all impacts, "regardless of whether those impacts are attributable coextensively to other causes" and therefore held that "the baseline approach to economic analysis is not in accord with the language or intent of the ESA." *Id.* at 1285.

While the Tenth Circuit is correct that the ESA requires some economic analysis, it is wrong when it holds the baseline approach violates the language of the statute. Apparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another

way to require the Service to perform a more rigorous economic analysis. This is an instance of a hard case making bad law.

The D.C. District Court has had a handful of cases considering the legality of the baseline approach. One unpublished decision that predates the Tenth Circuit decision concludes that the baseline approach is entirely proper and that to take into account economic costs already "incurred as a result of *listing*" would violate the ESA. *Trinity Cty. Concerned Citizens v. Babbit*, No. 92–CV–1194, 1993 WL 650393, at *4 (D.D.C. Sept.20, 1993). Two recent cases, while not expressly rejecting the baseline approach, approved consent decrees opposed by interveners in which the Service and plaintiffs agreed to perform a non-baseline analysis consistent with the "well-reasoned" *N.M. Cattle Growers* decision. *Home Builders Assoc. of N. Cal. v. Norton*, 293 F.Supp.2d 1, 4 (D.D.C.2002); *Nat'l Assoc. of Home Builders v. Evans*, No. 00–CV–2799, 2002 WL 1205743 (D.D.C. Apr.30, 2002). With respect for the judges who found the Tenth Circuit opinion "well-reasoned," this Court agrees with the reasoning set forth in *Trinity County* and finds the Tenth Circuit's rejection of the baseline approach ill advised.

 The baseline approach is a reasonable method for assessing the actual costs of a particular critical habitat designation. To find the true cost of a designation, the world with the designation must be compared to the world without it. This is precisely the advice that the Office of Management and Budget gives to federal agencies conducting impact analysis: "Identify a baseline. Benefits and costs are defined in comparison with a clearly stated alternative. This normally will be a "no action" baseline: what the world will be like if the proposed rule is not adopted." *Office of Management and Budget, Circular A–4: Regulatory Analysis* 2 (Sept. 17, 2003).

In order to calculate the costs above the baseline, those that are the "but for" result of designation, the agency may need to consider the economic impact of listing or other events that contribute to and fall below the baseline. The Service, however, must not allow the costs below the baseline to influence its decision to designate or not designate areas as critical habitat. That would be inconsistent with the ESA's prohibition on considering economic impacts during the species listing process.

 Therefore, this Court concludes that while the Tenth Circuit's rejection of the baseline approach is unfounded, the Fifth and Ninth Circuit's rejection of the regulation supporting the Service's functional equivalence doctrine is well reasoned. With these principles, the Court now turns to the economic impact analysis for the piping plover designation.

### 2. Functional equivalence and the regulatory definitions

 When designating habitat for the plover, the Service did not adhere to strictest functional equivalence approach. In other critical habitat designations, the Service has claimed that there will be no additional impact due to the designation, *e.g., N.M. Cattle Growers Ass'n*, 248 F.3d at 1280 ("[D]esignation will ... result in no additional protection for the flycatcher nor have any additional economic effects beyond those that may have been caused by listing and by other statutes."). Here, the Service recognizes that some, albeit minimal, additional impacts will result. *Compare* AR 13387 ("While the economic analysis considered the effect that critical habitat designation could have on ... activities, any costs associated with these activities within critical habitat would most likely occur as a result of the listing."), *with* AR 13358 ("Because we designate only areas within the geographic range

occupied ... any activity that would result in an adverse modification of the plover's critical habitat would virtually always also jeopardize the continued existence of the species."). The Service acknowledges some potential economic impacts to consultation costs related to the designation: first, some completed consultations for projects still underway may need to be updated; second, future consultations may take longer due to the need to consider critical habitat concerns. AR 13387.

Based on these statements, the Court cannot conclude that the Service treated the jeopardy and adverse modification consultation triggers as identical; however, the Service appears to have minimized the economic impact of designation through its application of the invalid regulatory definition of adverse modification. In response to one comment, the Service approvingly cites its prior statement that "[a]ccording to our interpretations of the regulations, by definition, the adverse modification of critical habitat consultation standard is nearly identical to the jeopardy consultation standard." AR 13357 (citing 64 Fed. Reg. 31,872 (June 14, 1999)). Further, an agency's actions get a presumption of regularity: in this case, the Service is presumed to have followed its definition of the adverse modification consultation trigger. *Gifford Pinchot,* 378 F.3d at 1071 (citing *Overton Park,* 401 U.S. at 415, 91 S.Ct. 814). Use of that definition created an "impropriety in the process." *Id.*

Still, if the Service can demonstrate that this error was harmless, the Court may not intervene. 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error"). Here, the Service does not make the harmless error argument; rather, it apparently stands behind the functional equivalence doctrine and makes no apologies for its regulation.. Defs. Opp. at 29–30. On the other hand, upon reading portions of the cited administrative record, it is clear that the economic impact analysis considered a study of the effects of Atlantic piping plover recovery efforts and made use of the report in its analysis of the effects of designation on tourism. AR 09379. While the report, therefore, offers some evidence that the Service did consider recovery effects, not only effects related to ensuring both survival and recovery, the Court nonetheless asks the Service to clarify or modify its position on remand. The Service's regulations and practices that embrace functional equivalence have been confusing for too long.

### 3. *The economic impact analysis methodology*

■ The Service hired Industrial Economics, Inc. to prepare a report analyzing the economic impact of critical habitat designation. That report's claimed methodology was to "distinguish between economic impacts caused by the ESA listing of the piping plover and those additional effects that would be caused by the proposed critical habitat designation." AR 09339. Thus, "[t]he analysis attempts to evaluate economic impacts related to the proposed critical habitat designation that are the result of future consultations regarding critical habitat .... The report does not attempt to evaluate the cost of listing." *Id.* (quoted material emphasized in original).

The report further describes its approach as finding "the increment of economic impacts" and "measuring the net change." *Id.;* see also AR 13366 (adopting this view into the final rule). "Determinations of whether a land use or activity would face additional modifications or costs under the proposed critical habitat designation are based on discussions with the Service." AR 09361. The report continues:

the Service believes that, for all pro-posed units, any costs that are incurred are most likely attributable to the listing of the species, due to the fact that they consider all units to be occupied. Howev-er, various Federal action agencies may view the designation of critical habitat as providing new information and require-ments. Thus, this analysis considers up-per-bound cost estimates, reflecting the assumption that some additional impacts may be experienced as a result of criti-cal habitat designation.

AR 09364.

At first blush, the report gives the ap-pearance that it follows a baseline method-ology, but a closer reading of the quoted material shows this is not so. The analysis "does not attempt to evaluate the cost of listing" and "considers upper-bound cost estimates, reflecting the assumption that some additional impacts may" result from designation. Nowhere does the report identify the baseline costs. It identifies baseline statutory regimes, AR 09346–56, but does not assign costs of impacts amongst baseline and designation. The report's case studies are actually "intended for use by the Service in understanding the potential economic impact of critical habitat designation in a given unit, recog-nizing that (1) these costs may be attribut-able to the listing or other baseline re-quirement." AR 09333. Therefore, the report does not itself follow the baseline approach; rather, it follows the approach required by the Tenth Circuit in *N.M. Cattle Growers*—to consider all the im-pacts of designation, even those co-exten-sive with listing, *see* 248 F.3d at 1285, and leaves the Service with the task of filtering out irrelevant costs based on the report's description of the baseline regime.

The Service clearly understood its task. It recognized that the economic report considered the costs of all expected consul-tations, even if those consultations would have occurred based on listing alone. AR 13387. Then, the Service permitted only the economic impacts above the baseline to influence its decision to designate or not designate certain areas of critical habitat. Though the Service's analysis of what costs belong to the baseline and what costs are "but for" designation is scant, this is likely attributable to the Service's reliance on functional equivalence and the discred-ited regulatory definitions in 50 C.F.R. § 402.02. The baseline methodology set forth in the final rule is itself sound and in accordance with the law.

#### 4. *Other alleged defects in the econom-ic analysis*

Finally, plaintiffs challenge two addition-al aspects of the Service's economic analy-sis.

██ First, plaintiffs generally allege that the Service failed to consider the true economic effect of the critical habitat des-ignation, not on consultations, but on the kinds of activities in which plaintiffs en-gage. The economic analysis is in the form of a case study, AR 09368, and thus does not discuss the effects of the designa-tion on everyone who might be affected. The report nonetheless discusses the im-pact to tourism and recreation, AR 09379–80, and to small business concerns, includ-ing the concerns of North Carolina recre-ational businesses, AR 09382–83, and the report concluded the designation would not significantly harm these interests. Fur-thermore, the Service's rule contains com-ments and responses to comments made about specific activities of concern to plain-tiffs. Specifically, the Service considered the impact of off-road vehicles driving and other human use of beaches and deter-mined that designation was expected to have no effect on such use. AR 13349. The Service made this determination after

evaluating the scientific literature, the fact that no beach closures resulted from the plover's listing in 1986, and the fact that wintering plovers are less affected by humans than breeding populations. *Id.* However, the Service made no attempt to reconcile this conclusion with a contradictory statement in the final rule: the National Park Service can typically protect federal lands, such as the CHNS, from adverse modifications due to beach driving by "redesignating routes and beach access points, and by temporarily closing off specific areas during critical seasons." AR 13352. If the service has specifically addressed the economic implications of this statement or specifically questioned its validity, the Court cannot find the spot. While the economic report cites the Service's "no effect" conclusion, it never mentions off-road vehicle driving. Thus, the Court concludes that the "no effect" conclusion has no connection to the facts found and is therefore arbitrary and capricious and must be revisited.

Second, plaintiffs point out an apparent commission in the economic report. The Service notes that the National Park Service oversees all activities at the CHNS, AR 00994, AR 13352. In a chart of projected consultation costs, the economic report indicates that the National Park Service is a possible source of consultations but indicates that the Park Service is not an expected source of consultations in North Carolina units NC–1 to NC–5. AR 09367. Rather, the report predicts consultation costs related to the Army Corp of Engineers and Coastal Zone Management Funds. *Id.* The Service never responds to this oddity. It is not clear whether the report omits consultation costs related to the Park Service or concluded that no such costs exist. The Service needs to respond on remand.

F. Best scientific data available

 Interveners make the broad argument that the Service's designation must stand despite any shortcomings because it was based on the "best scientific data available." 16 U.S.C. § 1533(b)(2). Whether the service used the best science available as a basis for its designation is a red herring issue. The Service's need to use only the best science available, as opposed to perfect science, does not excuse any failure by the Service to comply with statutes. Simply put, the Service may not designate habitat, regardless of the quality of underlying scientific data, unless it follows statutory and regulatory requirements. In fact, as the Interveners themselves point out, the correct regulatory response when critical habitat is indeterminable due to lack of data is to refrain from designation. 50 C.F.R. § 424.12(a)(2)(i)-(ii); Interveners' Br. at 7.

V. *Application of NEPA to the Service's critical habitat designation*

Earlier in this Memorandum Opinion, the Court found that, under this Circuit's precedent, plaintiffs' recreational interests in designated lands supported their standing to bring a NEPA claim. Now the Court reaches the merit of that claim: whether these plaintiffs, based on their interests, may require the Service to prepare a NEPA statement related to the designation of critical habitat for the piping plover.

The National Environment Policy Act ("NEPA"), requires, "to the fullest extent possible," all agencies of the federal government to prepare environment impact statements for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The statement must include: "(i) the environmental impact of the proposed action, (ii) any adverse environ-

mental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*

The Service's policy is to not prepare NEPA environmental impact statements for critical habitat designations in addition to the analysis of economic and other relevant impacts it conducts pursuant to the ESA. 48 Fed.Reg. 49,244 (Oct. 25, 1983). The Service followed its policy when it designated critical habitat for the wintering piping plover, and thus did not prepare a NEPA statement. AR 13391. Plaintiffs argue that the Service's non-compliance with NEPA resulted in its failure to sufficiently consider how its designation would impact recreational activities requiring vehicular access, beach repair and maintenance after storms such as Hurricane Isabel, and federal projects related to beach nourishment, navigational dredging, and hydrocarbon exploration. *See* Pl. Br. at 44; AR 16268, 15081, 15804 (comments submitted to the Service).

■ NEPA's strong language "is neither accidental nor hyperbolic," but "is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle," *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976); however, NEPA does not apply to all federal actions, *e.g. Envtl. Def. Fund v. EPA,* 489 F.2d 1247 (D.C.Cir.1973). When the government acts pursuant to a second statute, NEPA's statement requirement must give way, under the law in this Circuit, "where a clear and unavoidable

conflict in statutory authority exists," *Flint Ridge,* 426 U.S. at 788, 96 S.Ct. 2430, and where the second statute ensures functional equivalence with NEPA, *Environmental Defense Fund,* 489 F.2d at 1256–57. Neither the Service nor the Interveners present either of these arguments.

Instead the Service relies on a recent Ninth Circuit decision that held NEPA inapplicable as a matter of law to critical habitat designations. *Douglas Cty. v. Babbitt,* 48 F.3d 1495 (9th Cir.1995). That decision supplied three alternate reasons: (1) the ESA displaced NEPA's procedures; *Douglas Cty.,* 48 F.3d at 1502; NEPA does not apply when "a federal agency takes an action that prevents human interference with the environment," *id.* at 1506, "or do[es] nothing to alter the natural physical environment," *id.* at 1505; and the ESA furthers the goals of NEPA without requiring an environmental impact statement, *id.* at 1506–07. One year after this Ninth Circuit decision, the Tenth Circuit issued a decision rejecting the Ninth Circuit's analysis and holding that NEPA does apply to critical habitat designations. *Catron Cty.,* 75 F.3d at 1437.

■ The first and third reasons advanced by the Ninth Circuit, both concerning the relationship of the ESA and NEPA, are both premised on the faulty idea that the ESA repealed or replaced NEPA by implication. Given the different purposes and requirements of these statutes this Court follows the Tenth Circuit's well-reasoned opinion that NEPA applies to designations. The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of [certain] treaties and conven-

tions." 16 U.S.C. § 1531(b). It requires designation of habitat that in some way is essential to the a species's conservation, *id.* at § 1532(5)(A), "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact," *id.* at § 1533(b)(2). On the other hand, NEPA's broader purpose is:

> To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321. NEPA requires detailed statements that address the impact of federal actions on the physical environment. *Metropo. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) (discussing NEPA and limiting "environment" to "physical environment."). Thus, while the critical habitat designation under the ESA protects endangered and threatened species and their ecosystems, NEPA is concerned not with animal life but humans' physical environment.[7] Both statutes require public airing of impacts, but each statute involves different impacts and protects different interests. While there may be some overlap of interests and some parallels in procedure, "partial fulfillment of NEPA's requirements ... is not enough" when the act calls for compliance "to the fullest extent possible." *Catron*

*Cty.*, 75 F.3d at 1437. To ignore NEPA while designating critical habitat is to argue for NEPA's implicit repeal by the ESA and amendments to the ESA, an argument not supported by the ESA's text or the legislative history. *See id.* at 1439; *see also Tenn. Valley Auth,* 437 U.S. at 189, 98 S.Ct. 2279 (reiterating the "cardinal rule ... that repeals by implication are not favored").

 With the issue of how NEPA and ESA relate now settled, the Service nonetheless maintains that NEPA does not apply because the critical habitat designation for piping plover does not involve alterations to the physical environment. NEPA, on its face, applies when "actions significantly affect[ ] the quality of the human environment," 42 U.S.C. § 4332(2)(C), but the Supreme Court has limited the otherwise impossibly broad term "environment" by noting that "the statute shows that Congress was talking about the physical environment-the world around us, so to speak. NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metropo. Edison Co.,* 460 U.S. at 772, 103 S.Ct. 1556. The Ninth Circuit held that the Supreme Court's statements make NEPA inapplicable to critical habitat designation, because while a designation may restrict certain human activities on land, it does not involve "changes" to the physical environment or interfere with its natural "shifts" and "changes." *Douglas Cty.,* 48 F.3d at 1506.

Again, the Ninth Circuit's reasoning cannot be followed. First, NEPA's lan-

---

7. Because the ESA is not a general environmental statute, the Service's "raison d'etre," when implementing the ESA is not the "protection of the environment" and its designation decision is not "necessarily infused with the environmental considerations so pertinent to Congress in designing the statutory framework [of NEPA]." *Int'l Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 650 (D.C.Cir.1973).

guage does not talk of changes to the environment but of actions that "significantly affect[ ]" its quality. 42 U.S.C. § 4332(2)(C). Then, the Ninth Circuit does not contemplate how placing restrictions on land use which benefit a species may harm the human environment, may significantly affect it, by preventing or restricting certain activities. This case provides concrete examples. Plaintiffs fear that the plover designation will prevent or restrict them when they undertake essential repair and maintenance operations on its beaches or from enjoying the recreational riches of the CHNS. The plover designation does significantly affect the quality of the human environment and the Service needs to determine the extent of the impact in compliance with NEPA.

## VI. *Scope of remedy*

The Service and Interveners request that any remedy this Court grants to plaintiffs be limited to the areas in North Carolina units at issue in this case. In reply, plaintiffs state that such relief would be adequate. The Court will therefore limit its injunction to the units NC–1, NC–2, NC–4, NC–5. *See* Compl. ¶ 1.

## VII. *Conclusion*

For the forgoing reasons, the Court grants in part and denies in part each party's motion for summary judgment and awards summary judgment in part to plaintiffs and in part to defendants. The Court shall issue an order this date consistent with this Memorandum Opinion.

## ORDER

Upon consideration of the parties' cross motions [19 and 21] for summary judgment, the oppositions and replies thereto, and the administrative record, the Court, consistent with its Memorandum Opinion issued this date, issues this Order. It is hereby

ORDERED that the parties' motions are GRANTED IN PART and DENIED IN PART;

ORDERED that plaintiffs' motion for summary judgment is GRANTED and defendants' motion is DENIED as to plaintiffs' claim that the Service has not complied with its statutory obligation under 16 U.S.C. § 1532(5)(A)(i) to only designate as occupied critical habitat those areas where the pertinent physical or biological features are "found";

ORDERED that plaintiffs' motion for summary judgment is GRANTED and defendants' motion is DENIED as to plaintiffs' claim that the Service has not complied with its statutory obligation under 16 U.S.C. § 1532(5)(A)(i) to only designate as occupied critical habitat those areas containing physical or biological features that "may require special management consideration or protection";

ORDERED that defendants' motion for summary judgment is DENIED and plaintiffs' motion is GRANTED as to the Service's claim that it properly designated piping plover critical habitat as unoccupied critical habitat;

ORDERED that plaintiffs' motion for summary judgment is GRANTED and defendants' motion is DENIED as to plaintiffs' claim that the Service failed to adequately evaluate the economic impacts of designating critical habitat for the wintering piping plover.

ORDERED that plaintiffs' motion for summary judgment is GRANTED and defendants' motion is DENIED as to plaintiffs' claim that the Service erred in failing to complete an assessment meeting the requirements of the National Environmental Policy Act ("NEPA");

ORDERED that for all other claims, defendants' motion for summary judgment is GRANTED and plaintiffs' motion is DENIED;

ORDERED that the Final Determination of Critical Habitat for Wintering Piping Plovers, 66 Fed.Reg. 36,038 (July 10, 2001), but only insofar as it designates areas NC–1, NC–2, NC–4, and NC–5, is VACATED and REMANDED to the defendants for further action in compliance with the this Order and with the Memorandum Opinion issued this date.

SO ORDERED.