**Paul and Gayle FISHER and Perdido Key Property Rights, Inc., a Florida corporation, Plaintiffs,**

v.

**Ken SALAZAR, in his official capacity as Secretary of the Interior; U.S. Department of the Interior; United States Fish and Wildlife Service; and Rowan Gould, in his official capacity as Acting Director, United States Fish and Wildlife Service, Defendants.**

No. 3:07cv530–WS.

United States District Court,
N.D. Florida,
Pensacola Division.

Aug. 4, 2009.

Nicholas M. Gieseler, Pacific Legal Foundation, Stuart, FL, for Plaintiffs.

Clifford Eugene Stevens, Jr., U.S. Dept of Justice, Washington, DC, Robert Del Stinson, U.S. Attorney, Tallahassee FL, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILLIAM STAFFORD, District Judge.

The plaintiffs, Paul and Gayle Fisher (the "Fishers") and Perdido Key Property Rights, Inc. ("PKPR") (collectively, "Plaintiffs"), filed this action alleging that the defendants (collectively, "Defendants"), through the United States Fish and Wildlife Service ("FWS"), designated critical habitat for the Perdido Key beach mouse "without adequate delineation or justification and without sufficient analysis of the economic and other impacts of the designation." Before the court at this time are the parties' cross-motions for summary judgment. Docs. 28 & 35. The motions have been fully briefed, docs. 29, 30, 36, 37, 40, 41 & 48; and the parties have been advised (doc. 57) that the motions would be taken under advisement as of a date certain. For reasons explained below, Defendants' motion will be granted.

## I. BACKGROUND

### A.

The Endangered Species Act of 1973 (the "ESA" or the "Act"), 16 U.S.C. §§ 1531–1544, was enacted by Congress "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA defines the terms "conserve" and "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." *Id.* at 1532(3). As noted by the Fifth Circuit in *Sierra Club v. United States Fish and Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001), the objective of the ESA "is to enable listed species not merely to survive, but to recover from their endangered or threatened status."

Generally regarded as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the ESA makes the Secretaries of Commerce and of the Interior responsible for administering and enforcing the Act. The Secretary of the Interior is responsible for terrestrial and freshwater fish species, while the Secretary of Commerce is responsible for marine species. The Secretary of the Interior has delegated the responsibility for terrestrial species, including the Perdido Key beach mouse, to the FWS.

The ESA requires the FWS to maintain a list of both endangered and threatened species. A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* at § 1532(20). Determinations as to

whether a species should be listed as endangered or threatened must be made "solely on the basis of the best scientific and commercial data available." *Id.* at § 1533(b)(1)(A). Economic impacts are not factored into the listing determination.

Concurrently with making a determination that a species should be listed as endangered or threatened, the FWS is required to designate—"to the maximum extent prudent and determinable"—the listed species' critical habitat. *Id.* at § 1533(a)(3)(A).[1] Critical habitat may include geographical areas that are both inside of and outside of the geographical areas occupied by the species. Specifically, "critical habitat" for an endangered or threatened species means:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* at § 1532(5)(A). The ESA requires the FWS to make the designation decision "on the basis of the best scientific date available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* at § 1533(b)(2). The FWS may "exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species." *Id.*

Section 7(a)(2) of the ESA requires federal agencies to consult with the FWS—in what are known as "Section 7" consultations—to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat of such species." *Id.* at § 1536(a)(2). Thus, when a species is listed and regardless of whether critical habitat has been designated, an agency must consult with the FWS when an action might "jeopardize the continued existence of any endangered species or threatened species." If critical habitat has been designated, an agency must consult with the FWS when an action might result in the "destruction or adverse modification" of that designated habitat. Actions that have no federal nexus, that are not authorized, funded, or carried out by a federal agency, do not require a Section 7 consultation.

Under FWS regulations promulgated in 1986, the jeopardy standard relevant to listing—"to jeopardize the continued existence of" a species—means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. The standard relevant to

---

1. Congress has made clear that a "not prudent" finding regarding critical habitat "was intended . . . to be exercised only rarely." S. Rep. 106–126, at 4 (1999), 1999 WL 33592886; *see also* H.R.Rep. No. 95–1625, at 16–17 (1978) (noting that "[i]t is only in rare circumstances where the specification of critical habitat concurrently with the listing would not be beneficial to the species").

critical habitat designation—"the destruction or adverse modification of habitat"—means "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.* The regulation thus defines the jeopardy and destruction/adverse modification standards in terms of both survival and recovery.

Once a species has been listed as endangered, and regardless of whether critical habitat for that species has been designated, the ESA and the regulations promulgated thereunder prohibit certain actions taken by any person that may adversely affect the listed species. 16 U.S.C. § 1538. Among other things, the Act makes it unlawful for any person to "take" an endangered species. *Id.* at § 1538(a)(1)(B). The term "take" means "an act which actually kills or injures wildlife," including any act that may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *see also* 16 U.S.C. § 1532(19).

The ESA may allow "the taking [of an endangered species] otherwise prohibited by [the Act] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). If "incidental take" is expected during the development of land, whether or not the land is designated as critical habitat, the landowner must apply for a permit from the FWS. An applicant for an incidental take permit must submit to the FWS a conservation plan, specifying—among other things—the impacts likely to result from a taking, the steps to be taken to minimize and mitigate those impacts, and the funding that will be available to implement those steps. *Id.* at § 1539(a)(2)(A). Because incidental take becomes a factor based on a species' *presence* on land, the FWS has a specific protocol for determining the presence or absence of beach mice. In the words of the FWS:

> A single trapping event can provide evidence of beach mouse presence in an area if beach mice are caught[;] however[,] due to detection probabilities, a single trapping event, during which no beach mice were caught, does not determine absence. Our trapping protocol recommends quarterly trapping for two years as necessary to determine absence of beach mice.

Final Rule, 71 Fed. Reg. 60238, 60241 (Oct. 12, 2006). If presence of beach mice is documented on private lands where no critical habitat designation exists, private landowners are nonetheless required to minimize impacts on the beach mouse and, where applicable, to obtain permits and perform mitigation. On the other hand, according to FWS, neither a permit nor mitigation is required for property owners who rebuild within the footprint of previous developments.

### B.

The Perdido Key beach mouse can be found in the wild only on Perdido Key, a barrier island consisting of 2,943 acres of coastal land from Perdido Pass in Alabama to Pensacola Bay in Florida. Historically, this mouse ranged the entire length of Perdido Key (16.9 miles), inhabiting burrows dug into primary, secondary, and higher-elevation scrub dunes. By 1980, the effects of human development, coupled with a 1979 category 4 hurricane, led to the extirpation of all but a single colony of thirty mice living at Gulf State Park at the westernmost end of Perdido Key.

The Perdido Key beach mouse was first listed as endangered on June 6, 1985. Critical habitat—consisting mainly of primary and secondary dunes—was designat-

ed for the mouse at the time of listing.[2] The 1985 designation, which included three units totaling approximately 1,020 acres of state and federal land, did not include high-elevation scrub dunes. Although the beach mouse inhabits scrub dunes less frequently than primary and secondary dunes, scrub dune habitat provides refuge for the mice during and after storms, offers sources of food not available on primary and secondary dunes, and provides a source of mice for re-colonization of storm-damaged habitat.

The FWS was petitioned to revise critical habitat on Perdido Key in 1991 by the Alabama Conservancy and again in 1999 by the Sierra Club and Biodiversity Legal Foundation. On both occasions, the FWS concluded that revision was warranted based on new information regarding the beach mouse's use of scrub habitat, habitat that had not been previously designated. *See* Notice of Intent, 58 Fed. Reg. 33606, 33606 (June 18, 1993); Notice of Finding, 65 Fed. Reg. 57800 (Sept. 26, 2000). On neither occasion, however, did the FWS follow through with a rule revising the designation of critical habitat. Consequently, in 2003, the Sierra Club and Biodiversity Legal Foundation filed suit in the United States District Court for the Southern District of Alabama, seeking an order requiring the FWS to revise its designation of critical habitat for the Perdido Key beach mouse. The action was voluntarily dismissed in early 2006 after the FWS published a proposed rule revising the designation. Proposed Rule, 70 Fed. Reg. 74426 (Dec. 15, 2005). A final rule designating revised critical habitat was published on October 12, 2006. Final Rule, 71 Fed. Reg. 60238 (Oct. 12, 2006).

The 2006 final rule designates 1300 acres—991 acres of public land and 309 acres of private land—as critical habitat for the Perdido Key beach mouse. Specifically, the revised designation consists of five land units that, together, comprise a little less than half of the total acreage of Perdido Key. Numbered geographically from west to east, three of the units, PKBM–1 (Gulf State Park), PKBM–3 (Perdido Key State Park), and PKBM–5 (Gulf Islands National Seashore), consist of federal or state lands. The two remaining units, PKBM–2 (West Perdido Key) and PKBM–4 (Gulf Beach), consist of private lands.

PKBM–1, or unit 1, includes 115 acres in southern Baldwin County, Alabama, on the westernmost end of Perdido Key. While beach mouse habitat in this unit—the Gulf State Park unit—consists of primary, secondary, and scrub dunes, scrub habitat is separated from the frontal dunes by a highway, reducing the accessibility of such habitat. Gulf State Park was occupied by the beach mouse at the time of listing and, by 1986, contained the only known existing population of the subspecies. In 1986, mice from Gulf State Park were used to re-establish the Perdido Key beach mouse population in PKBM–5, the Gulf Islands National Seashore unit. This re-establishment project ultimately saved the Perdido Key beach mice from extinction as the population at Gulf State Park was considered extirpated in 1998 due to tropical storms and predators.

PKBM–2, or unit 2, consists of 33 acres, including primary, secondary, and scrub dunes, in southern Baldwin County, Alabama, and 114 acres in southern Escambia County, Florida. Although this unit was not occupied by the beach mouse at the time of listing, the FWS determined—based on observations of beach mouse bur-

---

**2.** Primary dunes are those closest to the shoreline. Secondary dunes consist of one or more dune lines landward of the primary dune with a similar, though denser, vegetative cover.

rows and tracks—that the unit was occupied when critical habitat was revised. The unit was described by the FWS as "essential to the conservation of the species because it provides essential connectivity . . . between two more contiguous habitat patches (Perdido Key State Park and Gulf State Park), [and because it] provides habitat for expansion, natural movements, and re-colonization." 71 Fed. Reg. at 60251.

PKBM–3, or unit 3, the Perdido Key State Park unit, consists of 238 acres of primary, secondary, and scrub dune habitat in southern Escambia County, Florida. Perdido Key beach mice were known to inhabit this unit in 1979. Hurricane Frederic (1979) impacted the population, however; and no beach mice were captured in the park during extensive surveys in the early 1980s. The unit was accordingly considered unoccupied at the time of listing in 1985. In 2000, the beach mice were successfully reestablished in this unit as part of the FWS's recovery efforts.

PKBM–4, or unit 4, consists of 162 acres of private land in southern Escambia County, Florida. Primary, secondary, and scrub dunes are present in this unit. Although the unit was not known to be occupied at the time of listing, the presence of beach mice was confirmed in 2004 by live-trapping efforts. Like unit 2, this unit is considered by the FWS to be essential to the conservation of the species because it provides connectivity between two existing populations of beach mice (Perdido Key State Park and Gulf Islands National Seashore) and because it provides essential habitat for expansion, natural movements, and re-colonization.

PKBM–5, or unit 5, the Gulf Islands National Seashore unit, consists of 638 acres at the easternmost end of Perdido Key. Beach mouse habitat in this unit consists mainly of primary and secondary dune habitat. Perdido Key beach mice were known to inhabit this unit in 1979,

before Hurricane Frederic hit the island. Because no beach mice were captured at this location during extensive surveys in the early 1980s, the unit was considered unoccupied at the time of listing. In 1986, Perdido Key beach mice were re-established in this unit as part of FWS's recovery efforts. In 2000 and 2001, beach mice captured from this unit served as donors to re-establish the mice at Perdido Key State Park (unit 3).

### C.

The ESA does not alone impact development on Perdido Key. The State of Florida regulates development in coastal areas through the Beach and Shore Preservation Act (the "BSPA"). Fla. Stat. §§ 161.011–.45. Among other things, the BSPA requires the Florida Department of Environmental Protection ("FDEP") to establish coastal construction control lines ("CCCL") on a county basis along the sand beaches of the state. *Id.* at § 161.053(1)(a). Such lines are established "so as to define that portion of the beach-dune system which is subject to severe fluctuations based on a 100–year storm surge, storm waves, or other predictable weather conditions." *Id.* While new construction and alterations to existing structures seaward of the CCCL may be allowed, these activities require a CCCL permit from the FDEP. *Id.* at § 161.053(5). As a condition for issuing such permits, the FDEP may "require mitigation, financial, or other assurances acceptable to the department as may be necessary to assure performance of the conditions of a permit." *Id.* at § 161.053(5)(f). With limited exceptions (including exceptions for single-family dwellings and for maintenance and repair activities to existing structures and structures pre-dating the control line), permits for construction seaward of the CCCL are not allowed if the construction will also be

seaward of a 30–year erosion line. The 30–year erosion line is determined as the point seaward of the seasonal high water line within 30 years after the date of a permit application.

Like the federal government, the State of Florida has an Endangered and Threatened Species Act. Fla. Stat. § 379.2291. By rule, the Florida Fish and Wildlife Conservation Commission ("FFWCC") has listed the Perdido Key beach mouse as an endangered species and has provided that "[n]o person shall pursue, molest, harm, harass, capture, possess, or sell [the Perdido Key beach mouse], or parts thereof or their nests or eggs except as authorized by specific permit, permits being issued only when the permitted activity will clearly enhance the survival potential of the species." Fla. Admin. Code r. 68A–27.003(1)(x) (2009). Like the federal ESA, which requires incidental take permits for lands actually inhabited by beach mice, the state rule requires permits for lands that are, in fact, occupied by the mice.

Like the federal and state governments, Escambia County, Florida, (the "County") regulates endangered species. In particular, the County has enacted an ordinance requiring persons who propose to impact "threatened or endangered species habitat" ("TE habitat") to submit an application that provides written documentation demonstrating that impacts to TE habitat have been avoided and/or minimized to the maximum extent possible. Escambia County Land Development Code § 7.13.01. TE habitat is defined as:

> An area that contains, or shows factual evidence of, a species that is listed by a federal, state, or local agency as "threatened," "endangered," or "species of special concern." All areas that are classified as "critical Habitat" by the U.S. Fish and Wildlife Service are included in this definition.

*Id.* at § 3.00.01. If an applicant demonstrates adequate minimization of unavoidable impacts to TE habitat, then the applicant must submit a mitigation plan for review and consideration by County officials. Mitigation procedures are required in any case where development may degrade TE habitat. *Id.* at § 7.13.03.C.

In December of 2005, a year before the FWS issued its final rule revising the designation of critical habitat, the Board of County Commissioners entered into an agreement with the FFWCC and the FWS to establish a unified process for mitigating impacts to the Perdido Key beach mouse. Wanting to establish a single administrative mechanism for managing and spending funds generated from various sources for beach mouse conservation, the parties established a conservation fund— the Perdido Key Conservation Management Fund—into which both state and federal permitting applicants may voluntarily contribute funds as a means of mitigating the effects of development on the beach mouse. The three governmental parties agreed to a unified mitigation fee of $100,000 per acre of impact, plus a recurring fee of $201 per development unit per year. The availability of this unified contribution approach was expected to streamline the permitting process, thereby reducing costs and delays, by simultaneously meeting the requirements of all three levels of government (county, state, and federal).

### D.

Paul and Gayle Fisher allege in their complaint that they are property owners and residents of Perdido Key, Escambia County, Florida. In 2004, Perdido Key was devastated by Hurricane Ivan, a category 3 hurricane. The Fishers maintain that they "have been unable to rebuild after their homes were destroyed by Hurricane Ivan." Compl. at ¶ 5. Without elaboration, they assert that "[their] ability . . .

to use their land, including the restoration of property destroyed by Hurricane Ivan, is undermined by the designation of critical habitat for the mouse." *Id.* They further assert that "the critical habitat designation imposes conditions on the lawful use of Plaintiffs' land." *Id.* at ¶ 39. Their complaint is silent about what those "conditions" are. Particulars about their properties or their injuries are not alleged.

PKPR, a Florida corporation, is a civic organization, the members of which own real property or have a bona fide interest in real property on Perdido Key. PKPR maintains that the "ability of PKPR shareholders to use their land, including the restoration of property destroyed by Hurricane Ivan, is undermined by the designation of critical habitat for the Perdido Key beach mouse." PKPR alleges no other particulars about its members, their properties, or their injuries.

## II. *DISCUSSION*

### A.

Among other things, Defendants raise the issue of standing in their motion for summary judgment. According to Defendants, Plaintiffs have fallen far short of identifying any injury-in-fact "that is concrete and particularized, as well as actual or imminent, that causally is connected to the critical habitat designation, and that is likely to be redressed by a decision in [their] favor."

In response to Defendants' motion for summary judgment, the Fishers each submitted a very brief affidavit, attesting to nothing more than that the FWS's designation of critical habitat "undermined" his/her ability to use his/her property. Having provided no "specific facts" about their properties or their injuries as required under *Bischoff v. Osceola County, Florida,* 222 F.3d 874 (11th Cir.2000),[3] the court gave Plaintiffs the opportunity to submit a proffer of other evidence to establish their standing to sue in this case. *See* Doc. 58. Plaintiffs responded with additional argument but with no additional affidavits containing plaintiff-specific facts.

■ As to the three units located on public lands, Plaintiffs have made no attempt at all to establish standing to challenge the designation of those units as critical habitat. Consequently, to the extent, if any, that Plaintiffs seek to invalidate the critical habitat designation of PKBM–1 (Gulf State Park), PKBM–3 (Perdido Key State Park), and PKBM–5 (Gulf Islands National Seashore), their suit must be dismissed for lack of standing.

In their respective affidavits, Paul and Gayle Fisher state that he/she is "a property owner of a residence on Perdido Key" who has "been unable to rebuild after . . . Hurricane Ivan." Neither provides any other particulars, including whether their residence(s) was/were in unit 2 or 4,[4]

---

**3.** In *Bischoff,* the Eleventh Circuit Court of Appeals explained:

> The party invoking federal jurisdiction bears the burden of proving standing. Moreover, each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's

> conduct may be sufficient to show standing. However, when standing is raised at the summary judgment stage, the plaintiff can no longer rest on "mere allegations." Instead, the plaintiff must " 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." *Bischoff,* 222 F.3d at 878 (citations omitted).

**4.** In a footnote to their reply memorandum (doc. 48), Defendants state that "[t]he Fishers' land (not including the footprint of their prior structure) is included in Unit 2, which has

whether the property and/or rebuilding site falls seaward of the State's CCCL or 30–year erosion line,[5] whether rebuilding is possible within the foot print of the original residence(s), or whether any of the exceptions to the State's permitting process are applicable. Quite simply, the facts " 'set forth' by affidavit or other evidence" are so minimal as to preclude this court's finding on a motion for summary judgment that the Fishers have standing to challenge the critical habitat designation of either unit 2 or 4, the only two units consisting of private lands.

The same is true of the corporate plaintiff, PKPR. Having provided no information about its members or where the members' property is/was located, the court is unable to decide whether PKPR has standing to challenge the designation of unit 2, unit 4, or both.

### B.

Even if the court were to assume, for the sake of argument, that Plaintiffs do have standing to challenge the designation of unit 2, unit 4, or both, the court finds that they have not demonstrated that the FWS's designation is invalid.

In challenging the FWS's critical habitat designation, Plaintiffs have invoked both the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), as well as the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Claims under both statutes are reviewed under the APA's arbitrary and capricious standard, which provides that a court shall set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at § 706(2)(A). An agency rule is arbitrary and capricious "if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This standard of review is "exceedingly deferential." *Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir.2008). While a court must ensure that the agency came to a rational conclusion, the court may not substitute its own judgment for the agency's decision. *Miccosukee Tribe of Indians of Florida v. United States,* 566 F.3d 1257, 1264 (11th Cir.2009). As explained by the Eleventh Circuit Court of Appeals:

> This standard upholds agency actions as long as there is a rational basis for the agency decision. The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise. Indeed, courts must be extremely deferential when an agency's decision rests on the evaluation of complex scientific data within the agency's technical expertise. In such a situation, although a reviewing court may not rubber stamp an agency decision, it must look at the [agency's] decision not as the chemist, biologist, or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising ... certain minimal standards of rationality.

> Further, [when an agency] is compelled to exercise its judgment in the face of scientific uncertainty [(]unless

---

[post-Hurricane Ivan] documented evidence of [beach mouse burrows and tracks]."

5. In a footnote to their reply (doc. 40), it is stated that "[t]he Fishers concede that the footprint of their former structure is seaward of the coastal construction control line."

that uncertainty is so profound that it precludes any reasoned judgment[) ], [e]ven probative preliminary data not yet certifiable as "fact" may provide an appropriate basis for promulgation of regulations. Generally, it is only when a model bears no rational relationship to the characteristics of the data to which it is applied that we will hold that the use of the model was arbitrary and capricious.

*Miami–Dade County v. United States EPA,* 529 F.3d 1049, 1065 (11th Cir.2008) (internal quotation marks and citations omitted).

The burden of proof under the arbitrary and capricious standard is on the party challenging an agency's decision. *Cape Hatteras Access Preservation Alliance v. United States Dep't of Interior,* 344 F.Supp.2d 108, 119 (D.D.C.2004). In this case, Plaintiffs have failed to demonstrate that FWS's final rule designating critical habitat was arbitrary and capricious and have thus failed to meet their burden of proof.

### 1.

■ In defining critical habitat, the ESA differentiates between geographical areas that were occupied by the species at the time of listing and those that were not occupied by the species at the time of listing. For areas that were occupied by the species at the time of listing, critical habitat is limited to those areas containing "physical or biological features (I) essential to the conservation of the species and (II) which may require special management consideration or protection." 16 U.S.C. § 1532(5)(A)(i). For geographical areas that were not occupied by the species at the time of listing, critical habitat is limited to "areas essential for the conservation of the species." *Id.* at § 1532(5)(A)(ii).[6]

Thus, to satisfy the first part of the statutory definition, but not the second, the FWS must identify certain "physical or biological features" of the critical habitat. Also referred to as "primary constituent elements" or "PCEs," 50 C.F.R. § 424.12, "physical or biological features" "may include, but are not limited to; roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." *Id.* at § 424.12(b).

Here, the parties agree that, of the five areas now designated as critical habitat for the Perdido Key beach mouse, four areas (units 2 through 5) were either not known to be occupied, or were confirmed to be unoccupied, at the time of listing. Unit 1, the Gulf State Park Unit, is the only unit which was known to be occupied by the beach mouse at the time of listing. Accordingly, the first part of the critical habitat definition applies only to unit 1. Because Plaintiffs have not demonstrated their standing to challenge unit 1, the court need not consider whether the FWS adequately identified "those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."

As to units 2 and 4, the units containing private lands, the FWS was required to show only that those areas "are essential for the conservation of the species." The FWS explained in its final rule, dated October 12, 2006, that both units are essential for the conservation of the beach mouse because they connect adjacent habitat units and because they provide habitat needed for storm refuge, expansion, natu-

---

**6.** The regulations similarly provide that areas not currently occupied by the species may be designated as critical habitat only "when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e).

ral movements, and re-colonization. 71 Fed. Reg. at 60251–60252. The FWS based its essential-for-conservation finding [7] on the small island's past history of storm-related extirpations and re-colonizations, on observations, on trapping results, and on the scientific literature. A peer review, moreover, raised no issues with regard to the FWS's finding that units 2 and 4 are areas essential for the conservation of the beach mouse. In fact, the reviewers—five individuals with scientific expertise that included familiarity with the species, the geographic region in which the species occurs, and conservation biology principles—concurred generally with the FWS's methods as well as its conclusions.

Regarding the need for connectivity, the FWS summarized the conclusions it reached—based, among other things, on various scientific studies—as follows:

> Habitat loss and fragmentation associated with residential and commercial real estate development is the primary threat contributing to the endangered status of beach mice. Coastal development has fragmented all the subspecies into disjunct populations. Isolation of habitats by imposing barriers to species movement is an effect of fragmentation that equates to reduction in total habitat. Furthermore, isolation of small populations of beach mice reduces or precludes gene flow between populations and can result in the loss of genetic diversity ... Demographic factors, such as predation (especially by domestic cats), diseases, and competition with house mice, are intensified in small, isolated populations that may be rapidly extirpated by these pressures. Especially when coupled with events such as storms, reduced food availability, and

reduced reproductive success, isolated populations may experience severe declines or extirpations. The strength of influence these factors have on populations or individuals is largely dependent on the degree of isolation.

> Connectivity becomes essential where mice occupy fragmented areas lacking one or more habitat types. If scrub habitat is lacking from a particular tract, adjacent or connected tracts with scrub habitat are necessary for food and burrow sites when resources are scarce in the frontal dunes, and are essential to beach mouse populations during and immediately after hurricanes. Trapping data suggest that beach mice occupying the scrub following hurricanes recolonize the frontal dunes once vegetation and some dune structure have recovered. Similarly, when frontal dune habitat is lacking from a tract and a functional pathway to frontal dune habitat does not exist, beach mice may not be able to obtain the resources necessary to expand the population and reach the densities necessary to persist through the harsh summer season or the next storm. Functional pathways may allow for natural behavior such as dispersal and exploratory movements, as well as gene flow to maintain genetic variability of the population within fragmented or isolated areas. To that end, contiguous tracts or functionally connected patches of suitable habitat are features that are essential to the long-term conservation of beach mice.

*Id.* at 60248 (citations omitted).

According to the FWS, the designation of units 2 and 4 as critical habitat not only helps to assure that the beach mouse's

---

**7.** Plaintiffs contend that the FWS failed to make the required "findings" that units 2 and 4 are areas "essential for the conservation of the species." Plaintiffs suggest that, instead, the FWS made mere "statements" that do not rise to the level of "findings." The record establishes otherwise.

future will not depend on the disconnected and isolated populations in units 1, 3, and 5, populations that history and science have shown may be wiped out by storms, inadequate genetic diversity, and/or other pressures. The designation of units 2 and 4 also helps to make scrub dune habitat accessible to mice inhabiting areas where accessible scrub dunes are lacking. Specifically, unit 4 provides scrub dunes that are lacking in unit 5; unit 2 helps remedy the lack of accessible scrub dune habitat in unit 1. This attention to connecting scrub dune habitat is important because, as noted in the final designation rule, recent research indicates that beach mice use interior scrub habitat on a permanent basis and that this habitat serves an invaluable role in the persistence of beach mouse populations after storm events. *Id.* at 60240.

In challenging the FWS's designation of units 2 and 4 as critical habitat, Plaintiffs argue that the FWS failed to adequately identify and/or define PCEs, failed to describe how the stated PCEs will serve the FWS's conservation goals, failed to determine that the stated PCEs are essential to meeting those conservation goals, and failed to identify the specific areas that may require special management considerations or protection. In so arguing, Plaintiffs rely on that part of the critical habitat definition that applies to geographical areas known to be occupied by the species at the time of listing, the part that defines critical habitat as containing "those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). For units 2 and 4, neither of which was known to be occupied at the time of listing, the FWS was not required to identity PCEs. Instead, the FWS was required to find that units 2 and 4 are "areas essential for the conservation of the species." This the FWS did, and Plaintiffs

have altogether failed to demonstrate that the FWS's essential-for-conservation decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### 2.

The ESA requires the FWS to designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Neither the statute nor the regulations prescribe any particular method for determining the economic impact of a designation. Moreover, in the statute's legislative history, Congress explained that "[t]he Secretary is not required to give economics or any other 'relevant impact' predominant consideration in his specification of critical habitat." Instead, "[t]he consideration and weight given to any particular impact is completely within the Secretary's discretion." H.R.Rep. No. 95–1625, at 16–17 (1978), *as reprinted* in 1978 U.S.C.C.A.N. 9453, 9467.

At one time, the FWS considered only those economic impacts that would not occur *but* for the critical habitat designation. Any economic impacts also attributable to other factors, such as the listing of a species, were excluded. This approach, known as the baseline approach, "involves comparing the state of the world without or before the designation, the baseline, with the state of the world with or after the designation." *Cape Hatteras Access Preservation Alliance,* 344 F.Supp.2d at 127. The difference between the two worlds represents the impact of the designation.

The FWS long ascribed to the theory that little actual impact flows from the critical habitat designation, that impacts instead flow primarily from listing deci-

sions. This theory—the "functional equivalence" theory—had its root in the regulatory definitions functionally equating the Chapter 7 jeopardy standard (relevant to listing) with the destruction-or-adverse-modification standard (relevant to critical habitat designation). As mentioned earlier, Chapter 7 of the ESA requires consultation with the FWS—with substantial economic impacts—whenever action taken by a federal agency is "likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Under the regulations, a proposed agency action must affect both the survival and recovery of a species before a consultation is required under either the jeopardy standard or the destruction-or-adverse-modification standard. 50 C.F.R. § 402.02. Relying on the regulatory definitions, the FWS long asserted that, because actions likely to destroy or modify a species' critical habitat are also likely to jeopardize the species' existence, the designation of critical habitat would provide no additional benefits to a species beyond the protections available through a jeopardy consultation. In other words, the FWS typically found that no Chapter 7 consultations were likely to result as a *but for* effect of the critical habitat designation because any such consultations were first required as a result of listing. The baseline approach thus commonly resulted in a finding that no incremental economic impacts were attributable to habitat designation.

The Fifth and Ninth Circuits have rejected the "functional equivalence theory" and have invalidated the regulation that defines "destruction or adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." 50 C.F.R. § 402.02. *See Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir.2004); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir.2001). These courts concluded that, by requiring Chapter 7 consultations only where a destruction-or-adverse-modification action affects both the recovery *and* survival of a species, the regulations fail to provide protection of habitat when necessary only for conservation of the species. The Ninth Circuit explained:

> Congress, by its own language, viewed conservation and survival as distinct, though complementary, goals, and the requirement to preserve critical habitat is designed to promote both conservation and survival. Congress said that "destruction or adverse modification" could occur when sufficient critical habitat is lost so as to threaten a species' recovery even if there remains sufficient critical habitat for the species' survival. The regulation, by contrast, finds that adverse modification to critical habitat can only occur when there is so much critical habitat lost that a species' very survival is threatened. The agency's interpretation would drastically narrow the scope of protection commanded by Congress under the ESA.

*Gifford Pinchot,* 378 F.3d at 1070. The Fifth Circuit provided a similar explanation:

> The ESA defines "critical habitat" as areas which are "essential to the conservation" of listed species. "Conservation" is a much broader concept than mere survival. The ESA's definition of "conservation" speaks to the recovery of a threatened or endangered species. Indeed, in a different section of the ESA, the statute distinguishes between "conservation" and "survival." Requiring consultation only where an action affects the value of critical habitat to both the recovery and survival of a spe-

cies imposes a higher threshold than the statutory language permits.

*Sierra Club,* 245 F.3d at 441–42.

Without considering the validity of the regulatory definitions, the Tenth Circuit rejected the baseline approach in *New Mexico Cattle Growers v. United States Fish & Wildlife Service,* 248 F.3d 1277 (10th Cir.2001). The FWS in that case had designated critical habitat after determining that the designation resulted in no economic impacts. In reaching its no-economic-impact result, the FWS used a baseline approach in the context of its functional equivalence theory. In other words, the FWS moved all economic impacts attributable to listing to below the baseline, leaving no above-the-baseline economic impacts attributable to critical habitat designation. Challenging the FWS's approach, the plaintiffs argued for an approach that "would take into account all of the economic impact of the [critical habitat designation], regardless of whether those impacts [were] caused co-extensively by any other agency action (such as listing) and even if those impacts would remain in the absence of the [critical habitat designation]." *Id.* at 1283. Recognizing that the FWS's baseline approach, as used in that case, rendered all but meaningless Congress's command that economic impacts be considered when designating critical habitat, the court concluded that "Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *Id.* at 1285.

Other courts have since declined to follow the Tenth Circuit's co-extensive approach. *See Arizona Cattle Growers' Asso. v. Kempthorne,* 534 F.Supp.2d 1013, 1035 (D.Ariz.2008) (finding the Tenth Circuit's co-extensive approach inconsistent with the ESA because, among other things, it permits consideration of impacts that are not a but-for result of the designation decision); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.,* 422 F.Supp.2d 1115, 1152 (N.D.Cal.2006) (finding the baseline approach a reasonable method for assessing the actual costs of a particular habitat designation); *Cape Hatteras,* 344 F.Supp.2d at 129–30 (declining to follow the Tenth Circuit in its rejection of the baseline approach). The *Arizona Cattle Growers'* court explained:

As a result of *Gifford Pinchot,* the problem that the Tenth Circuit confronted—the functional equivalence of the jeopardy standard and the adverse modification standard—was eliminated. Reflecting on the Tenth Circuit's reasoning, the *Cape Hatteras* court wrote, "[a]pparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another way to require the Service to perform a more rigorous economic analysis. This is an instance of a hard case making bad law." 344 F.Supp.2d at 130. This Court agrees. With the revitalized definition of "adverse modification," the Service must consider recovery when consulting on critical habitat, distinguishing those consultations initiated pursuant to the jeopardy standard. Accordingly, additional economic impacts will be associated with Section 7 consultations concerning critical habitat, and the two can no longer be considered functionally equivalent.

. . . .

. . . [T]o determine the economic impacts of a critical habitat designation, the Service must examine those impacts solely attributable to that decision. As stated by the D.C. District Court, "[t]o find the true cost of a designation, the world with the designation must be compared to the world without it." *Cape Hatteras,* 344 F.Supp.2d at 130. The

economic impact created by a critical habitat designation is naturally the mathematical difference between those two worlds. Where a coextensive approach is taken, the Service goes beyond the command of the ESA by examining impacts that exist independent of the critical habitat designation. This only inhibits the resolution of the ultimate question—whether economic impacts suggest that exclusion of certain areas outweighs the benefits of inclusion—and confuses the real costs of making the designation.

*Arizona Cattle Growers' Ass'n,* 534 F.Supp.2d at 1035.

The courts in *Cape Hatteras, Arizona Cattle,* and *Center for Biological Diversity,* all determined—and this court agrees—that the baseline approach is a reasonable method, consistent with the language and purpose of the ESA, for assessing the actual costs of a particular critical habitat designation. Congress specified that, when deciding whether or not to designate critical habitat, the FWS shall take into consideration "the economic impact . . . *of specifying any particular area as critical habitat.*" 16 U.S.C. § 1533(b)(2) (emphasis added). In the words of the *Cape Hatteras* court: "[T]o find the true costs of a designation, the world with the designation must be compared to the world without it." 344 F.Supp.2d at 130. Costs that exist independently of the critical habitat designation cannot be costs "of specifying any particular area as critical habitat." Such independent costs represent a baseline that must not influence the decision to designate or not designate areas as critical habitat. To the extent the Tenth Circuit's co-extensive approach permits consideration of costs not attributable to the designation, it is inconsistent with the mandate of the ESA.

■ In this case, the FWS hired Industrial Economics, Inc., to prepare a report analyzing the economic impacts of critical habitat designation on Perdido Key and elsewhere. The consultants' report—dated September 8, 2006—describes the framework for analysis in some detail, relevant parts of which include:

> The purpose of this report . . . is to quantify the economic effects associated with the proposed designation of critical habitat. It does so by taking into account the cost of conservation-related measures that are likely to be associated with future economic activities that may adversely affect the habitat within the proposed critical habitat boundaries.

> . . . .

> This analysis identifies those economic activities believed to most likely threaten the listed species and its habitat and, where possible, quantifies the economic impact to avoid, mitigate, or compensate for such threats within the boundaries of the CHD. . . . [D]ue to the difficulty in making a credible distinction between listing and critical habitat effects within critical habitat boundaries, this analysis considers all future conservation-related impacts to be co-extensive with the designation.

> Coextensive effects may also include impacts associated with overlapping protective measures of other Federal, State, and local laws that aid habitat conservation in the areas proposed for designation. In past instances, some of these measures have been precipitated by the listing of the species and impending designation of critical habitat. Because habitat conservation efforts affording protection to a listed species likely contribute to the efficacy of the CHD efforts, the impacts of these actions are considered relevant for understanding the full effect of the proposed CHD.

> . . . .

This analysis assumes that the conservation activities associated with the beach mice may result in impacts to landowners by imposing the following costs: (1) increased administrative costs to secure incidental take permits, including associated project delay costs; (2) on-site project modification costs to protect the species; and (3) land value losses associated with development restrictions, i.e. required land setbacks or set-asides. Future development projects on Perdido Key are assumed to make a one-time payment of $100,000 into a conservation fund for each acre of beach mouse habitat impacted as well as an annual payment of $201 per housing unit constructed in critical habitat.

A.R. 2844–45, 2848–49, 2871.

In its final rule designating critical habitat on Perdido Key, the FWS explained that, because of the Fifth and Ninth Circuits' decisions in *Gifford* and *Sierra Club,* the meaning of "destruction or adverse modification" was determined not on the basis of the regulatory definition but, instead, "on the basis of whether, with implementation of the proposed Federal action, the affected critical habitat would remain functional ... to serve the intended conservation role for the species." 71 Fed. Reg. at 60255. The FWS also explained that its economic analysis was "consistent with the ruling of the 10th Circuit Court of Appeals in *N.M. Cattle Growers Ass'n v. USFWS.*" in that it considered "the economic efficiency effects that may result from the designation, including habitat protections that may be co-extensive with the listing of the species." *Id.* at 60262. On the other hand, the FWS noted:

This analysis focuses on the direct and indirect costs of the rule. However, economic impacts to land use activities can exist in the absence of critical habitat. These impacts may result from, for example, local zoning laws, State and natural resource laws, and enforceable management plans and best management practices applied by other State and Federal agencies. Economic impacts that result from these types of protections are not included in the analysis as they are considered to be part of the regulatory and policy baseline.

*Id.*

In challenging the FWS's economic analysis, Plaintiffs first contend—without elaboration—that the FWS erred by using the baseline method rejected by the Tenth Circuit in *New Mexico Cattle Growers.* Plaintiffs point to language in the report prepared by Industrial Economics, Inc., explaining that the company's economic analysis took "into account the cost of conservation-related measures that are likely to be associated with future economic activities that may adversely affect the habitat within the proposed boundaries." A.R. 2844. Plaintiffs maintain that, by relying on costs associated with "future economic activities," the consultants necessarily pushed costs attributable to "past conservation efforts" below a baseline, thereby improperly ignoring them. While acknowledging that the consultants stated in their report that they employed the Tenth Circuit's co-extensive analysis, Plaintiffs suggest that, in fact, no such co-extensive analysis was conducted. Specifically, Plaintiffs assert that the consultants failed to assess the impacts attributable to the mouse's listing and to the "existing regulatory environment." According to Plaintiffs, the FWS—in reliance on the report of its consultants—violated the ESA by employing a baseline analysis rather than a co-extensive analysis.

In fact, the record suggests that the FWS assessed the economic impacts of its 2006 critical habitat designation using a mixed-model, employing both baseline and coextensive analyses. Plaintiffs have

failed to demonstrate that the FWS's choice of method was arbitrary or capricious. As explained above, the baseline method does not *per se* violate the ESA. To the extent the FWS used a baseline to identify costs that would not be attributable to the designation, there was no error. The consultants' report, moreover, makes clear that, "due to the difficulty in making a credible distinction between listing and critical habitat effects within critical habitat boundaries, this analysis considers *all future conservation-related impacts to be co-extensive with the designation.*" A.R. 2848–49 (emphasis added). In other words, listing and other impacts were not ignored by the FWS, provided those impacts were expected to result in costs to be incurred in conjunction with the designation. Indeed, the record establishes that the FWS treated the unified mitigation fee—a one-time contribution of $100,000 per acre of impact plus a recurring fee of $201 per development unit per year, the total intended to meet the mitigation requirements of all three levels of government (county, state, and federal)—as a co-extensive conservation-related effect of listing, overlapping governmental laws, and designation.[8]

Plaintiffs next contend that the FWS failed "to combine the effects of the designation with the effects of all other non-ESA regulations to ascertain whether the designation may prove to be the regulatory straw that breaks the local community's economic back." Doc. 28 at 17. To support their argument, Plaintiffs note that the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f, requires agencies to consider the cumulative effects of unrelated actions when engaging in a NEPA analysis. Plaintiffs cite to no authority that suggests, much less holds, that the FWS is required to consider the impacts of other regulatory schemes—including, as suggested by Plaintiffs, the Clean Water Act, the Beach and Shore Preservation Act, the Florida Endangered Species Act, the Coastal Barrier Resources Act, and the Coastal Zone Protection Act—when deciding whether or not to designate critical habitat. The ESA and its regulations require consideration of the economic and other impacts of a critical habitat designation, nothing more. *See Arizona Cattle Growers' Ass'n,* 534 F.Supp.2d at 1036 (rejecting the plaintiff's attempt to graft NEPA's cumulative-impacts analysis into the context of critical habitat designation).

Plaintiffs next contend that the FWS significantly understated costs associated with (1) the delay in obtaining regulatory approvals, and (2) the processing of state and local permits. In particular, Plaintiffs contend that the FWS failed to account for the delays and permit costs experienced by individual property owners wanting to rebuild after Hurricane Ivan devastated Perdido Key in 2004.[9] While recognizing that some private landowners indeed experienced regulatory delays and permitting impacts post-Hurricane Ivan, the consultants firm hired by the FWS found it difficult to accurately determine how many property owners would experience delays and/or permitting impacts *attributable to the 2006 designation of critical habitat on*

---

8. The consultants estimated that the total impact associated with the unified mitigation fee across Units 2 and 4 would be $78.5 million (in undiscounted dollars), the present value of which was estimated to be $76.3 million assuming a three percent discount rate or $74.2 million assuming a seven percent discount rate.

9. The *proposed* critical-habitat-designation rule was issued in December of 2005, more than a year after Hurricane Ivan. The final rule was issued in December of 2006, more than two years after Hurricane Ivan. Many landowners experienced post-Ivan delays and other problems *before* critical habitat was even proposed much less designated.

*Perdido Key.* The consultants experienced such difficulty despite having contacted area developers and other stakeholders to obtain cost information about increased administrative costs, including project delay costs. A.R. 2873. Among other things, in the Final Report prepared by the consulting firm, it is noted that some of the delays and permitting issues were—and would likely continue to be—caused by the unit cap placed by the State of Florida on the number of dwellings allowed on Perdido Key. As explained in the Economic Analysis Report:

> Due to its susceptibility to tropical storms and limited exit points to mainland Florida, Perdido Key is within the Coastal High Hazard Area. Consequently, the State of Florida has limited the number of dwelling units that can be located on Perdido Key.... [T]he unit cap is frustrating post-Ivan rebuilding efforts by preventing permit issuance for more units on a property than existed before the hurricane struck. As a result, damaged single-family homes and small condo developments have been unable to attract buyers who would want to rebuild more units on the properties.

*Id.* at 2884–85. It is also noted that some of the delays and permitting problems were—and would likely continue to be—caused by unresolved home insurance claims and the need for new and/or expanded insurance coverage. *Id.* at 2887. In addition, the consultants reported that, given the unified mitigation approach that was approved in 2005 by federal, state, and county governments, an approach that was intended to streamline the cumbersome permitting process that was in place when Hurricane Ivan blew through Perdido Key

in 2004, designation-related delay and permitting costs were expected to be minimal.[10] *Id.* at 2888.

Plaintiffs fall far short of demonstrating that the FWS's failure to quantify delay and permitting costs was arbitrary and capricious. To be sure, Plaintiffs cite to the comments of a county administrator who stated, on July 14, 2006, that "[a]t a minimum there have been lengthy time delays ... and these delays are ongoing." While opining that "[t]he economic impacts of these and other factors clearly should have been included in the analysis," A.R. 2378, the county administrator provides no specifics whatsoever. Indeed, neither the administrator's comments nor any other evidence cited by Plaintiffs demonstrates that, contrary to the conclusion of the economic consulting firm, the FWS could have accurately determined or quantified the delay and permitting costs, if any, attributable to critical habitat designation as opposed to other causes. Without more, the court has no basis for finding that the FWS's decision with regard to delay and permitting costs was arbitrary and capricious.

Finally, Plaintiffs make an argument—albeit a confusing one—that the FWS failed to adequately consider the distributional effects of the critical habitat designation, particularly the effects on small businesses. As explained in the consulting firm's final report, a distributional-effects analysis focuses on the question of how potential economic impacts of a critical habitat designation are likely to be distributed among particular groups or economic sectors. A.R. 2846. In this case, the analysis focused on seven categories of activi-

---

**10.** As reported in the consulting firm's Final Report, Escambia County's Development Monitoring and Tracking System showed that, as of July 1, 2005, six months before the FWS issued its proposed rule designating critical habitat and a year and a half before the FWS issued its final rule, approximately 70% of the allowable units on Perdido Key were already existing, currently under construction, or already permitted but not under construction. A.R. 2887.

ties that could involve small entities: private development activities, recreation, tropical storm and hurricane response activities, dredging and disposal operations, species management and habitat protection activities, road construction and maintenance, and military activities. A.R. 2968. The FWS determined that, for six of the seven categories (all but private development activities), economic impacts on small entities were not expected. Despite making the conservative assumption that all private owners of developable lands in the proposed critical habitat area would be small business developers, an assumption likely to overstate the actual impacts to small development firms, the FWS concluded that the economic impacts on small developers would be insignificant and not disproportionate.

Plaintiffs disagree with the methods and results of the consulting firm's distributional-effects analysis, but they altogether fail to establish that the FWS's reliance on that analysis was arbitrary and capricious. As mentioned above, an agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43, 103 S.Ct. 2856. Plaintiffs here have demonstrated nothing of the sort.

### III. *CONCLUSION*

To survive Defendants' motion for summary judgment, Plaintiffs must submit sufficient evidence (1) to establish their standing to sue, and (2) to establish a genuine issue of material fact with regard to whether the FWS's 2006 designation of critical habitat was arbitrary and capri-

cious. Because Plaintiffs have done neither, it is ORDERED:

1. Defendants' motion for summary judgment (doc. 35) is GRANTED.

2. Plaintiffs' motion for summary judgment (doc. 28) is DENIED.

3. The clerk is directed to enter judgment accordingly.